# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-DR-01085-SCT

*LEROY LYNCH*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/05/1998 |
| TRIAL JUDGE: | HON. KENNETH L. THOMAS |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MISSISSIPPI OFFICE OF CAPITAL POST-CONVICTION COUNSEL BY: LOUWLYNN VANZETTA WILLIAMS ROBERT RYAN WILLIAM J. CLAYTON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | LAWRENCE Y. MELLEN |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | GRANTED IN PART; DENIED IN PART - 02/15/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Leroy Lynch was charged with capital murder for his role in the 1995 robbery and killing of Richard Lee. Lynch was convicted following a jury trial and he was sentenced to death by lethal injection. This Court affirmed the convictions and sentence in *Lynch v. State*, 877 So. 2d 1254 (Miss. 2004). He now seeks leave to file a motion for post-conviction relief in the trial court.

**Statement of the Case**

¶2.    On November 15, 1995, Lynch drove with Kevin Scott from Clarksdale to Cleveland, Mississippi to search for a white Oldsmobile Sierra to replace the one Scott had wrecked the day before.  They scouted the parking lots of several retailers until they found Richard Lee parking a white Oldsmobile Sierra at the local Jitney Jungle.  The pair followed Lee to his home, where Scott confronted Lee with a gun and shot him in the head.  Scott took Lee's car and Lynch drove Scott's car home.  Police later found Lee's abandoned car as well as a jacket which contained Kevin Scott's wallet and a pistol which Lynch had taken from a relative.  Lynch testified that he was unaware that Scott would kill anyone.  Lynch was represented at trial by Azki Shah and represented on direct appeal by Azki Shah and Cheryl Webster.

**Analysis**

**I.    Ineffective Assistance of Trial Counsel.**

¶3.    This issue warrants further consideration in the trial court. The State asserts that Petitioner's claim of ineffective assistance should be procedurally barred pursuant to Miss. Code Ann. §§99-39-21(1) and 99-39-21(3) (Rev. 2000) which read in pertinent part:

> (1) Failure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were *capable of determination at trial and/or on direct appeal*, regardless of whether such are based on the laws and the Constitution of the state of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver.
> (3) The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal.

(Emphasis added). The State misreads the statute it cites, as this procedural bar applies when a defendant fails to raise issues which were ripe for presentation to the court on direct appeal. That was not the case for Petitioner, who was represented by the same counsel, Azki Shah, during trial and direct appeal.

¶4.    This Court has explained that where the defendant is represented by the same counsel at trial and on appeal, ineffective assistance claims have been asserted via proper post-conviction proceedings, even though the point was not preserved at trial and was not raised on direct appeal. *See Dunn v. State*, 693 So. 2d 1333, 1139-40 (Miss. 1997); *Read v. State*, 430 So. 2d 832, 838 (Miss.1983). This Court has explained that "[i]t is totally unrealistic to expect that the lawyer charged with ineffectiveness will raise and preserve the issue in the trial court. Even if he raised the issue, it is absurd to fantasize that this lawyer might effectively or ethically litigate the issue of his own ineffectiveness." *Read*, 430 So. 2d at 838. The procedural bar the State cites does not prohibit review in this case.

> The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

*Strickland v. Washington*, 466 U.S. 668, 686 (1984).

¶5.    One who claims ineffective assistance of counsel claimant must demonstrate that counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Id.* at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders

3

the result unreliable." ***Stringer v. State***, 454 So. 2d 468, 477 (Miss.1984) (citing ***Strickland***, 466 U.S. at 687).

¶6.     Defense counsel enjoys a presumption of competence. ***Washington v. State***, 620 So. 2d 966 (Miss.1993).  But even where professional error is shown, a reviewing court must determine whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Mohr v. State***, 584 So. 2d 426, 430 (Miss.1991).  For purposes of death penalty review, the most important inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently re-weighs the evidence--would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." ***Strickland v. Washington***, 466 U.S. at 695.

¶7.     In the present case, petitioner argues that trial counsel committed professional error in failing to file pre-trial motions until shortly before trial.  Petitioner asserts that trial counsel's lack of preparation is evidenced by the fact that he sought three continuances from May 1996 through November 1997.  Petitioner also points to the fact that trial counsel was involved in other cases at the time which eventually lead to Shah's disbarment.  Petitioner further highlights the fact that trial counsel made an untimely and unsuccessful attempt to file just one jury instruction on circumstantial evidence.  Trial counsel additionally failed to file a petition for writ of habeus corpus to have Scott testify at the trial. Scott had consistently told law enforcement officers that Lynch had nothing to do with the crime. It is undisputed that trial counsel failed to timely file his list of witnesses to be offered in mitigation of

4

sentencing. The record indicates that these witnesses might have testified to Lynch's mental state, as Petitioner alleges that he is mentally retarded, an assertion addressed in a separate issue.

¶8.     Shah's untimely disclosure of some mitigation witnesses led to their exclusion from the sentencing phase of the trial. Even the trial court characterized this omission as ineffective assistance of counsel. This certainly counts as professional error for purposes of making out a claim of ineffective assistance of counsel. It is somewhat speculative to say that a jury might not have voted to impose a death sentence had they known of any mental deficiency.

¶9.     As to trial counsel's licensing woes, although Shah's performance in other cases was so deficient as to lead to his disbarment, it does not follow that he was presumptively ineffective in his defense of Lynch on the charge of capital murder.

¶10.    Defense counsel's failure to pursue Petitioner's mental retardation claim and to offer sufficient mitigating evidence, at a minimum, entitles Petitioner to a hearing before the trial court on the issue of ineffective assistance of counsel. At the hearing, the trial court can determine whether defense counsel was deficient and in turn, the extent to which that deficiency, if any, prejudiced Petitioner.

## II.     Aggravating Factors Not Charged in the Indictment.

¶11.    Lynch argues that his death sentence must be vacated because the aggravating circumstances which charged capital murder were not included in the indictment. This issue

could have been raised on direct appeal and should now be procedurally barred from consideration. Miss. Code Ann. § 99-39-21 (Rev. 2000).

¶12.    Lynch cites the rulings of the United States Supreme Court in *Aprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), in which that Court held unconstitutional a sentencing scheme where a judge rather than a jury determined whether there were aggravating circumstances present to warrant imposition of enhanced punishment.

¶13.    Apprendi was charged with firing shots into the home of an African-American family in New Jersey.  He pled guilty to possession of a firearm for unlawful purpose.  After the judge accepted the guilty pleas, the prosecutor moved for an enhanced sentence on the basis that it was a hate crime.  Apprendi argued that he was entitled to have the finding on enhancement decided by a jury.  The U.S. Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi*, 530 U.S. at 490.

¶14.    In 2002, the U.S. Supreme Court decided *Ring v. Arizona*.  *Ring* addressed the issue of whether the Arizona capital sentencing process as upheld in *Walton v. Arizona*, 497 U.S. 639 (1990),  of a jury deciding guilt and a judge making findings on aggravating factors, could survive the *Apprendi* decision.  The Supreme Court decided it could not.

> [W]e overrule *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. *See* 497 U.S., at 647-649, 110 S.Ct. 3047. Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," *Apprendi*, 530 U.S., at 494, n. 19, 120 S.Ct. 2348, the Sixth Amendment requires that they be found by a jury.

6

*Ring*, 536 U.S. at 609. The Court specifically noted, "Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him." *Id*. at 597, n.4. Ring did not contend that his indictment was constitutionally defective, as does Lynch.

¶15. As a practical matter, Rule 7.06 of the Uniform Circuit and County Court Rules provides that an indictment shall be "a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation." A defendant is not entitled to formal notice of the aggravating circumstances to be employed by the prosecution, and an indictment for capital murder puts a defendant on sufficient notice that the statutory aggravating factors will be used against him. *Smith v. State*, 729 So. 2d 1191, 1224 (Miss. 1998) relying on *Williams v. State*, 445 So. 2d 798 (Miss. 1984).

> We believe that the fact that our capital murder statute lists and defines to some degree the possible aggravating circumstances surely refutes the appellant's contention that he had inadequate notice. Anytime an individual is charged with murder, he is put on notice that the death penalty may result. And, our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment.

*Williams*, 445 So. 2d at 804-05. This Court has consistently found this issue (failure to charge the aggravating factors in the indictment) to be without merit. *Havard v. State*, 928 So. 2d 771(Miss. 2006); *Knox v. State*, 901 So.2d 1257, 1269 (Miss. 2005); *Berry v. State*, 882 So. 2d 157, 172 (Miss. 2004).

7

### III. The Eighth Amendment and the Death Row Phenomenon.

¶16. Counsel for petitioner argues, without the benefit of authority, that Lynch has suffered cruel and unusual punishment simply by being placed on death row. A claim based on the Eighth Amendment could have been raised on direct appeal and should now be procedurally barred from further consideration. Lynch and other clients of the MOPCC claim to be languishing in fear of their execution and the uncertainty of when it will be carried out. The brief cites to the writings of existentialist author Albert Camus. Counsel for Lynch argues that hid execution eleven years after the offense will serve no purpose. This Court has considered and rejected this argument before. *Wilcher v. State*, 863 So. 2d 776, 834 (Miss. 2003); *Russell v. State*, 849 So. 2d 95, 144-45 (Miss. 2003); *Jordan v. State*, 786 So. 2d 987, 1028 (Miss. 2001). The issue is both procedurally barred and devoid of any merit.

### IV. Improper Admission of Crime Scene Photographs

¶17. Petitioner argues that he was denied his right to a fundamentally fair trial because photographs of the deceased were admitted into evidence during the sentencing phase of his trial. Trial counsel objected, and the prosecution countered by arguing that the photos would illustrate the acts which Lynch aided and abetted. The issue was capable of being raised on direct appeal and is now procedurally barred from collateral review in post-conviction proceeding. Miss. Code Ann. § 99-39-21(Rev. 2000).

### V. Cumulative Error.

¶18. Lynch argues generally that the alleged preceding errors, taken as a whole, deprived him of a fair trial. The standard for this Court's review of an appeal from a capital murder

conviction and death sentence is clear. Convictions upon indictments for capital murder and sentences of death must be subjected to "heightened scrutiny." *Balfour v. State*, 598 So. 2d 731, 739 (Miss. 1992) (citing *Smith v. State*, 499 So. 2d 750, 756 (Miss. 1986); *West v. State*, 485 So. 2d 681, 685 (Miss. 1985)). Under this standard of review, all doubts are to be resolved in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Id.* (quoting *Irving v. State*, 361 So. 2d 1360, 1363 (Miss. 1978)). *See also Fisher v. State*, 481 So. 2d 203, 211 (Miss. 1985).

¶19. With regard to the issue of alleged cumulative error, this Court took note of those capital cases in which the opinions of this Court articulated differing analyses. For example, in *McFee v. State*, 511 So. 2d 130, 136 (Miss. 1987) (rape conviction and life sentence affirmed), this Court individually addressed each assignment of error and found none (harmless or otherwise) by the trial court. Based on that finding, the Court stated:

> In sum, *McFee* contends that the cumulative effect of the alleged errors was sufficient to prejudice the jury, essentially allowing the State to convict him not of rape, but of murder. Yet, as discussed, neither the introduction of the photographs nor the prosecutor's comments constituted reversible error. As there was no reversible error in any part, so there is no reversible error to the whole.

*Id.* However, in *Jenkins v. State*, 607 So. 2d 1171, 1183-84 (Miss. 1992) (capital murder conviction and death sentence reversed and remanded), in which this Court found both harmless error and reversible error by the trial court, the Court stated:

> If reversal were not mandated by the State's discovery violations, we would reverse this matter based upon the accumulated errors of the prosecution. This Court has often ruled that errors in the lower court that do not require reversal standing alone may nonetheless taken cumulatively require reversal.

9

*Id.* (citing ***Griffin v. State***, 557 So. 2d 542, 552-53 (Miss. 1990)). And in ***Manning v. State,***
726 So. 2d 1152, 1198 (Miss. 1998) (capital murder convictions and death sentence
affirmed), after addressing 21 assignments of error with sub-parts, and after making
numerous findings of no "reversible error," the Court stated:

> This Court has held that individual errors, not reversible in themselves, may
> combine with other errors to make up reversible error. ***Hansen v. State***, 592
> So. 2d 114, 142 (Miss. 1991)[n5];***Griffin v. State***, 557 So. 2d 542, 553 (Miss.
> 1990). The question under these and other cases is whether the cumulative
> effect of all errors committed during the trial deprived the defendant of a
> fundamentally fair and impartial trial. Where there is "no reversible error in
> any part, . . . there is no reversible error to the whole." ***McFee v. State***, 511 So.
> 2d 130, 136 (Miss. 1987).

*Manning*, 726 So. 2d at 1198.

¶20.    To reconcile these different views, the Byrom court held:

> What we wish to clarify here today is that upon appellate review of cases in
> which we find harmless error or any error which is not specifically found to be
> reversible in and of itself, we shall have the discretion to determine, on a case-
> by-case basis, as to whether such error or errors, although not reversible when
> standing alone, may when considered cumulatively require reversal because
> of the resulting cumulative prejudicial effect. That having been said, for the
> reasons herein stated, we find that errors as may appear in the record before us
> in today's case, are individually harmless beyond a reasonable doubt, and when
> taken cumulatively, the effect of all errors committed during the trial did not
> deprive Michelle Byrom of a fundamentally fair and impartial trial. We thus
> affirm Byrom's conviction and sentence.

***Byrom***, 863 So.2d at 846-47. In the present case, the record supports no finding of error,
harmless or otherwise, upon the part of the trial court. We hold harmless any error on the
part of trial counsel. Consequently, there can be no prejudicial cumulative effect and no
adverse impact upon his constitutional right to fair trial. This issue is without merit.

**VI.    Eligibility for Execution**

10

¶21.    Petitioner alleges that he is mentally retarded within the meaning of the United States Supreme Court in *Atkins v. Virginia*, 536 U.S. 304 (2002) and thereby entitled to present evidence of such at a hearing before the trial court.  In *Atkins*, the United States Supreme Court determined that imposition of the death penalty on mentally retarded inmates constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.  *Id.* at 321.   The *Atkins* decision did not define who is or is not mentally retarded for purposes of eligibility for a death sentence but instead "leaves to the States the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Atkins*, 536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-17, 91 L. Ed 2d 335, 106 S. Ct. 2595 (1986)).

¶22.    This Court, in *Chase v. State*, 873 So. 2d 1013, 1029 (Miss. 2004), established these guidelines for determining mental retardation.

> We hold that no defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that: 1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association; 2. The defendant has completed the *Minnesota Multiphasic Personality Inventory-II (MMPI-II) and/or other similar tests*, and the defendant is not malingering.

(emphasis added) *Id.* at 1029.

¶23.    Accordingly, in Mississippi it is acceptable to utilize the MMPI-II and/or other similar tests. *Id.*  at 1029. This Court did not intend by its holding to declare the MMPI-II or any one test as exclusively sufficient. Having a variety of tests at their disposal, courts are provided with a safeguard from possible manipulation of results and diminished accuracy which might

11

result if courts are limited to one test. The United States Supreme Court mentioned the Wechsler Adult Intelligence Scales Test. *See Atkins*, 536 U.S. at 309 n.5. Other tests, as suggested by mental health experts, include the Structured Interview of Reported Symptoms (SIRS), the Validity Indicator Profile (VIP), and the Test of Memory Malingering (TOMM). *See* Douglass Mossman, *Atkins v. Virginia: A Psychiatric Can of Worms*, 33 N.M.L. Rev. 255, 277-78 (Spring 2003).

¶24.    The Court's interpretation in this case as to the proper test to be administered with regard to an *Atkins* hearing supercedes any contrary decisions. This Court neither endorses the MMPI-II as the best test nor declares that it is a required test, and decisions that state otherwise are expressly overruled. *See, e.g. Scott v. State*, 938 So. 2d 1233, 1238 (Miss. 2006) (holding that despite the doctor's use of a battery of other tests, administration of the MMPI-II is required prior to an adjudication of a claim of mental retardation); *Goodin v. State*, 856 So. 2d 267, 277 (Miss. 2003) (declaring that the MMPI-II is to be administered for a determination of mental retardation since it is the best test to detect malingering). Our trial courts are free to use any of the above listed and approved tests or other approved tests not listed to determine mental retardation and/or malingering by a defendant.

¶25.    Counsel for Petitioner offers a report that Lynch has an intelligence quotient (IQ) of 72. Mild mental retardation is typically used to describe people with an IQ level within an approximate range of 55-75. The State does not concede that Lynch is mentally retarded but admits that Lynch has made an adequate showing that he is entitled to be heard on the issue.

¶26. In accordance with the guidelines set forth in *Chase* and further set out herein, this Court remands the matter to the trial court, where it may employ any one of numerous acceptable tests, for an *Atkins* hearing. The trial court, after being presented with sound mental evidence prepared by experts, should render its decision accordingly.

¶27. **POST CONVICTION RELIEF GRANTED IN PART; DENIED IN PART.**

**WALLER, P.J., EASLEY, CARLSON, GRAVES AND DICKINSON, JJ., CONCUR. DIAZ, J., CONCURS IN RESULT ONLY. RANDOLPH, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, J. SMITH, C.J., JOINS IN PART. COBB, P.J., NOT PARTICIPATING.**

**RANDOLPH, JUSTICE, SPECIALLY CONCURRING:**

¶28. I concur with the majority opinion. I write separately for the benefit of our trial courts who are charged with the awesome responsibility of deciding whether a defendant is mentally retarded. The difficulty in performing this arduous task is accentuated by disagreements among mental health practitioners on the definition of mental retardation. One author fairly describes the trial court's quandary as follows:

> [A] source of uncertainty stems from the fact that, for many items, the test administrator has to decide how many points a subject's response deserves. In normal clinical use, these imperfections do not matter a great deal. When testing a defendant for whom a one or two point change in IQ score has life and death implications, however, clinicians may have a hard time being dispassionately 'objective' about how they interpret a response. The net result of all these imperfections is that judges, or juries, will often have a hard time deciding on which side of the arbitrary line between mentally retarded and merely 'dull' a defendant falls.

Douglas Mossman, M.D., *Atkins v. Virginia: A Psychiatric Can of Worms*, 33 N.M.L. Rev. 255, 270 (Spring 2003).

13

¶29. Although the American Association of Mental Retardation and the American Psychiatric Association caution against "using diagnostic categories for legal and social purposes," courts must have some benchmark. *Id.* at 271. "*Atkins* tells mental health professionals that despite any 'cautionary statements,' courts will use their classification to solve legal and social problems that lie far beyond the purpose and intent of psychiatric diagnosis." *Id.* at 289-90 (referring to *Atkins v Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)).

¶30. Some organizations to which many mental retardation professionals belong are zealous advocates for the abolishment of the death penalty, whether administered to retarded, dull, average, bright or genius individuals. Yet courts must rely upon these professionals, and other related experts, to comply with the mandate of the United States Supreme Court. In *Atkins*, the Supreme Court declared mentally retarded defendants are not to be executed under Eighth Amendment protection. *See Atkins,* 536 U.S. at 321. Unfortunately, the *Atkins* decision offered no substantive or procedural guidance to assist state trial courts in determining which defendants accurately qualify for such protection.

¶31. Resolution of such a complex question is both complicated and demanding as the science of determining mental retardation is ever-changing. "We are at the epicycle stage of psychiatry where astronomy was before Copernicus and biology before Darwin. Our inelegant and complex current descriptive system will undoubtedly be replaced by simpler, more elegant models." Mossman, 33 N.M.L. Rev. at 277-78.

¶32. Further,

14

[T]he diagnosis of mental retardation– despite its clinical usefulness– is an entirely artificial construct: the line that separates persons who receive this diagnosis from individuals whose mental capacities are only well below average is a changing and arbitrary one. There is no better illustration of this last point than decisions of the [American Association of Mental Retardation] to 'update' its definition of mental retardation *ten times* over the past century.

*Id*. at 265 (emphasis added).

¶33. The dilemma faced by the trial courts is highlighted by the following: (1) the definition promulgated by the American Association of Mental Retardation differs from the American Psychiatric Association's definition; (2) these definitions may be subject to change; and (3) cautionary statements have been issued regarding their use in legal proceedings. However, in the absence of utilizing such definitions, courts would have little or no assistance in making this determination. Thus, the courtroom becomes the crossroads where the paths of science and law must necessarily intersect.

¶34. The AAMR states:

Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work. *Mental retardation manifests before age 18*.

*Chase v. State,* 873 So.2d 1013, 1028 (Miss. 2004) (quoting *Atkins*, 536 U.S. at 308, n.3, *citing* Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed.1992) (emphasis added)).

¶35. The APA definition is as follows:

The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following

15

skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). *The onset must occur before age 18 years (Criterion C).* Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."

*Id.* (emphasis added).

¶36.   A host of tests are utilized to determine one's intelligence quotient, or IQ, such as the Stanford-Binet Intelligence Scale, the Wechsler Adult Intelligence Scale-Revised, and the Wechsler Adult Intelligence Scales III. However, the numbers IQ tests generate are

> far from being perfectly reliable measurements of a person's cognitive ability. Under the best conditions, IQ tests have a 'measurement error' of about five points. An individual who scores say, 68 on one administration has a ninety-five percent chance of scoring between 63 and 73 on subsequent administrations. More than half of those persons whose IQ results fall in the mildly retarded range receive scores of 65 to 70, that is, their scores' margin of error will include 70.

Mossman, 33 N.M.L.Rev. at 269-70 (citations omitted).

¶37.   Furthermore,

> IQ, after all, is not the factor that render[s] the imposition of the death penalty against those with mental retardation unjust. Rather, IQ is a proxy and an imperfect one at that, for a combination of factors, such as maturity, judgment, and the capability of assessing the consequences of one's conduct, that determine the relative culpability of a mentally retarded killer. Culpability, not IQ, should be the benchmark.

*Id.* at 287 (citation omitted).

¶38.   Dr. Mossman further explained:

> IQ scores are set up so that the "mean" or average score is 100, and the 'standard deviation'- a statistical term referring to mathematical properties of the Bell Curve is 15. Approximately ninety-five percent of a normally distributed population lies within two standard deviations of the mean, and individuals lying outside this arbitrary statistical boundary are often deemed

'abnormal.' A cut-off score of 'approximately 70,' two standard deviations below the mean score of 100 is the intelligence score used in the APA's current diagnostic manual to separate persons with mental retardation from those designated as having 'borderline intellectual functioning.' The modifier 'approximately' in the APA's diagnostic criteria reminds mental health professionals that using 70 as a cut-off score reflects a statistical convention rather than a natural boundary between two distinctive groups of individuals. When conscientious mental health professionals interpret IQ scores and plan treatment interventions, they keep in mind that someone who scores a 69 on an IQ test is practically indistinguishable from someone who scores 71, and that two persons with an IQ of, say, 67 and 73 have much more in common with each other than a person who scores 88. If pre-*Atkins* state statutes and post-*Atkins* decisions are any guide, however, legislatures and courts often ignore such considerations when they put *Atkins* into practice. Of the eighteen state statutes in effect when *Atkins* was decided, eleven had language that made specific IQ scores part of the criteria for exempting a defendant from facing a possible death penalty.

*Id.* at 268 (citations omitted).

¶39.    Of the eleven states cited above, nine of these states have a statute which specifically references an IQ score of 70 or below. Of these nine states, four of these states have held an IQ score of 70 or below creates a rebuttable presumption of mental retardation, while the remaining five states have stated a score of 70 or below, combined with subaverage adaptive functioning quantifies mental retardation. Of the remaining two states, Arkansas sets its requisite IQ level at 65 and Arizona holds that a score of 75 requires additional assessment, where an IQ of 65 creates a rebuttable presumption of mental retardation.[1] *Id.* at 268-69.

---

[1]Md. Ann. Code § 2-202(b)(1)(i) (2002) (IQ "of 70 or below"); Ky. Rev. Stat. § 532.130(2) (2002) (IQ "of 70 or below"); Tenn. Code Ann. § 39-13-203(a)(1) (2003) (IQ "of 70 or below"); N.M. Stat. Ann. § 31-20A-2.1(A) (2003) (IQ "of 70 or below"); Ark. Code Ann. § 5-4-618 (2) (2003) ("rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below"); Wash. Rev. Code § 10.95.030(2)(c) (2003) (defining significantly below average intellectual functioning as IQ less than 70); Neb. Rev. Stat. § 28-105.01(3) (2002) (stating that IQ less than 70 is "presumptive evidence of mental retardation"); S.D. Codified Laws § 23A-27A-26.2

Oklahoma's definition [of mental retardation] is substantially similar to the one found in DSM-IV-TR and requires a defendant "to prove he or she is mentally retarded by a preponderance of the evidence at trial." The court notes that "'[i]ntelligence quotients are one of the many factors that may be considered' and 'are not alone determinative' of mental retardation." Despite this, the court's definition states that "to be considered mentally retarded," a defendant must have "an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligent quotient test."

*Id.* at 275 (citation omitted).

¶40. An additional issue in all mental retardation claims is: Can the defendant achieve a desired diagnosis through manipulating, feigning or malingering for the purpose of avoidance of punishment? This issue was of concern to Justice Scalia in his *Atkins* dissent. He quoted Matthew Hale from three centuries ago, "[Determination of a person's incapacity] is a matter of great difficulty, partly from the easiness of counterfeiting this disability... and partly from the variety of the degrees of this infirmity, whereof some are sufficient, and some are insufficient to excuse persons in capital offenses. . . ." *Atkins v. Virginia,* 536 U.S. 304, 353, 122 S.Ct. 2242, 2268, 153 L.Ed. 2d 335, 374 (2002) (Scalia, J., dissenting) (quoting 1 Hale, Pleas of the Crown, at 32-33). Such concern is not relegated to Justice Scalia and Sir Chief

---

(2000) (stating that IQ less than 70 is "presumptive evidence of mental retardation"); Ariz. Rev. Stat. Ann. 13-703.02 (2003) (pre-screening IQ score of 75 triggers additional assessment; IQ less than 65 establishes rebuttable presumption of mental retardation); Fla. Stat. Ann. § 921.137(1) (2002) ("'significantly subaverage general intellectual functioning' means performance that is two or more standard deviations from the mean score on a standardized intelligence test"); N.C. Sess. Law 2001-346 § 1 ("'significantly subaverage general intellectual functioning' means performance that is two or more standard deviations from the mean score on a standardized intelligence test").

Mossman, 33 N.M.L. Rev. at 291.

Justice Hale. "A man may counterfeit himself to be mad, he may do it so cunningly as it cannot be discerned whether he be mad or so." Mossman, 33 N.M.L. at n. 176 (quoting Joel Eigen, Historical Developments in Psychiatric Forensic Practice: The British Experience, 6 Int'l J.L. & Psychiatry 423, 427-28 (1984) (quoting statement made in 1681 by Sir Robert Holbron)).

¶41.    Faking mental retardation in order to avoid punishment is not a matter to be taken lightly by any court, in any era.

> Presumably, courts can deal with false claims of mental retardation as well as they deal with false claims of medical and psychological problems that arise in a variety of other legal circumstances. Moreover, in considering Justice Scalia's concern [in Atkins], it is important to recognize that assessing malingering is a core skill for mental health clinicians, particularly in contexts where being (or appearing) ill may confer advantages (e.g. avoiding punishment. . .) on the evaluee.

*Id*. at 277 (citation omitted).

¶42.    Accordingly, safeguards should be instituted in order to ensure the validity of a claim of mental retardation, including tests in support thereof, so as to prevent the manipulation of the results and/or diagnosis. As the majority opinion clearly points out, courts may consider any number of tests to accurately determine the existence *vel non* of mental retardation. When considering the possibility of  "faking," "feigning" or "malingering" mental retardation, this Court has previously given credence to a portion of the MMPI-II that measures validity. However, the MMPI-II is not the *sui generis* test for the determination of mental retardation and according to one advocate, should be abandoned altogether. *See* Denis William Keyes, *Use of the Minnesota Multiphasic Personality Inventory (MMPI) to Identify Malingering Mental Retardation*, 42 Mental Retardation 151 (April 2004).

Nonetheless, other professionals continue to endorse its use. "Mental health professionals can use several tests specifically designed to detect feigned psychological problems, including the validity scales on the [MMPI-II]. . . ." Mossman, 33. N.M.L. at 278.

¶43.    The validity of a claim of mental retardation is best determined by a true and accurate picture of the defendant's formative years. Only if such evidence is non-existent or the defendant is still in his teens, should post-crime testing and evaluations serve as a guide to determine the validity of a claim of mental retardation. Post-crime testing increases the likelihood of attempts to manipulate, feign or through malingering, distort the diagnosis.

¶44.    Of evidentiary import, the definitions by both the AAMR and the APA agree that mental retardation manifests itself before the age of 18. Accordingly, the better practice, *i.e.,* the practice most likely to achieve the truth, is the consideration of historical data found in school, behavioral study, medical/mental health, employment records, and other pertinent data, inter alia, generated before the age of 18, to determine if mental retardation manifested itself before the age of 18. Some mental health practitioners suggest, "[E]xamination of diagnostic criteria suggests that mental retardation is hard to fake successfully, because the criteria require evidence that retardation began during childhood– evidence, that is, that the condition existed years before the defendant committed a capital crime." *Id.* at 276. The APA manual warns, "when deciding whether a person meets a particular legal standard of responsibility, 'additional information is usually required beyond that contained in the [manual's] diagnosis. This might include information about the individual's functional impairments and how these particular impairments affect the particular abilities in question.'"

20

*Id.* at 272 (citations omitted). A complete examination of a defendant's background is essential to determine the validity of a claim of mental retardation.

¶45.    Navigating through the turbid waters of the science of mental retardation no doubt presents difficulty. Not only must the trial court have at its disposal the requisite data and mental health evidence, the trial court must analyze all proffered testimony and reject not only "junk science," but also "junk scientists." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**CARLSON, J., JOINS THIS OPINION. SMITH, C.J., JOINS THIS OPINION IN PART.**