WALLER, CHIEF JUSTICE, DISSENTING:
 

 ¶ 30. Because the record was adequate and sufficient for Russell's
 
 Atkins
 
 evaluation, the trial court did not abuse its discretion in denying the State's motion to have Russell subjected to additional psychological testing by its privately retained expert. Accordingly, I respectfully dissent.
 

 ¶ 31. The majority contends that Russell conceded the need to undergo additional psychological testing by the State for an evaluation of his
 
 Atkins
 
 claim.
 
 See
 
 Maj. Op. at ¶¶ 3, 11, 14, 17, 22. At the time Russell's
 
 Atkins
 
 claim was remanded to the trial court, Russell was awaiting trial on an aggravated-assault charge in another case. In the course of those proceedings, Russell was ordered to undergo a mental evaluation at the State Hospital to assess his competency to waive his constitutional rights and his sanity at the time of the offense. The State, aware of Russell's
 
 Atkins
 
 claim, requested that Russell be
 evaluated one time for the purposes of both cases:
 

 [I]t would be judicially efficient and prudent for the safety of those who have to examine Defendant and transport him to said examination to have Defendant Russell examined at the Mississippi Hospital at Whitfield once rather than having to move him from maximum security twice. His alleged mental retardation is the basis for his motion to suppress as well as his pending status to be executed. Both issues will be before the Circuit Court of Sunflower County. The examination should determine if Defendant is mentally retarded, if this retardation, if such exist [sic], together with any other factors, rendered him incompetent to waive his constitutional rights, if the alleged mental retardation renders him incapable of being executed under Atkins,
 
 supra,
 
 and to determine his sanity at the time of the alleged offense.
 

 Russell agreed to this procedure on the condition that, to the extent possible, the results of his mental evaluation in the assault case would serve the State's purposes for the
 
 Atkins
 
 claim and that he would not be subjected to additional testing.
 

 ¶ 32. Russell's first evaluation occurred on April 1, 2006. In preparing for the testing, Dr. Reb McMichael asked Russell's attorney whether the information obtained from Russell could be used for his
 
 Atkins
 
 claim. Russell's attorney stated his understanding that the evaluations could be used to support or oppose Russell's pending
 
 Atkins
 
 claim. The majority then points out that Russell's attorney stated, "[t]his isn't going to be a complete
 
 Atkins
 
 assessment ...."
 
 See
 
 Maj. Op. at ¶¶ 11, 22. But a reading of the rest of this statement shows that it was no admission at all: "... but, to the extent that there's information obtained or history or what have you, that that's going to be ... serve for the purposes of subsequent, the [
 
 Atkins
 
 ] proceeding as well." At oral argument, in response to a question on this exact statement, Russell's attorney explained that he simply was acknowledging that additional sources of evidence would need to be collected to reach a determination on Russell's intellectual disability, specifically for adaptive functioning, which is largely based on secondary historical sources:
 

 We concentrated on conducting a detailed and thorough investigation of adaptive functioning. Dr. Goff went out and visited with eleven witnesses: three teachers, an employer or co-worker, neighbors, family members, people he had lived with, the aunts who had raised Mr. Russell. All of those persons were available to the State at all times. They could have gone and seen any of them. In fact, we provided in discovery their statements, four months before the hearing concluded in December. And the State chose to sit on its hands and not conduct any of that investigation. And so again, when the State complains that it has not had an opportunity to conduct an adaptive deficit assessment, that is a fault entirely of its own making. And Your Honor, I was referring in that interview with Dr. McMichael and Mr. Russell to the fact that this wouldn't be a complete
 
 Atkins
 
 evaluation, it was exactly that sort of thing that I had in mind-that they would have to go out into the community and do more for an
 
 Atkins
 
 evaluation. We weren't going to finish and have an
 
 Atkins
 
 report at the end of that interview.
 

 Further, during the hearing on the State's motion for an evaluation, Russell's attorney gave this response to the State's request for additional testing:
 

 We have no problem with the State doing whatever other investigation it needs to do to complete an investigation of the
 
 Atkins
 
 issue. If the doctors feel like they need to talk to other people, review other records, or do anything else, then we have no problem with that.
 

 Our only concern-the narrow area of dispute before your Honor today in this proceeding-is whether the State can obtain a court order to force Mr. Russell to submit to further testing by State experts, whether that's either appropriate, given the history, or whether it's necessary, given the testing that's already been done, and whether it's fair, given the defendant's rights in preparing and presenting his own case.
 

 Russell's appellate brief also addresses the State's assertion that Russell's 2006 evaluations did not constitute a sufficient basis to reach an
 
 Atkins
 
 determination:
 

 Dr. Macvaugh's testimony did highlight that there were large areas of work to be completed in his Atkins evaluation in the form of records collection and interview of collateral witnesses. However, none of these required re-testing of Mr. Russell and it is telling that the State chose not to conduct any of these parts of the Atkins evaluation, even after the defense provided records and witness statements in discovery.
 

 Respectfully, my reading of the record shows that Russell never conceded that additional psychological testing by the State was required for his
 
 Atkins
 
 claim.
 

 ¶ 33. The majority also states that, when the State moved to evaluate Russell for intellectual disability in 2012, it was requesting "
 

 the
 
 Atkins
 
 evaluation." Maj. Op. at ¶ 23 (emphasis in original). But the reports from Russell's 2006 psychological evaluations were not rendered meaningless in the
 
 Atkins
 
 context simply because they did not contain conclusions on Russell's intellectual disability. In fact, one of Dr. Macvaugh's colleagues at the State Hospital testified that sufficient testing had been conducted during those evaluations to offer an opinion on Russell's intellectual disability. At a pretrial hearing in Russell's assault case, Dr. Reb McMichael, one of the doctors from the State Hospital who had participated in Russell's 2006 evaluations with Dr. Macvaugh, specifically stated that Russell was not intellectually disabled based on that very same testing. On cross-examination, Dr. McMichael testified:
 

 Q: And he was not subjected to and didn't participate in the full range of testing and assessment that would ordinarily go into an assessment of mental retardation, correct?
 

 A: Not correct.
 

 Q: You think you've done everything you would need to do to conduct a mental retardation assessment in this case?
 

 A: I think that given all of the history that we reviewed in a three-hour interview and in many examples of his ability to understand and use language, I feel that I have adequately assessed whether or not Mr. Russell is mentally retarded.
 

 Thus, the precise question before this Court is not whether Russell's 2006 evaluations constituted a "complete
 
 Atkins
 
 evaluation," but whether the trial court could rely on the results of those evaluations, along with the other evidence before it, to reach a conclusion on Russell's
 
 Atkins
 
 claim without subjecting Russell to further psychological testing.
 

 ¶ 34. The procedural framework established by this Court in
 
 Chase v. State
 
 requires the petitioner to prove two elements by a preponderance of the evidence in order to succeed on an
 
 Atkins
 
 claim.
 
 Chase
 
 ,
 
 873 So.2d 1013
 
 , 1029 (Miss. 2004). First, the defendant must prove that he or she is intellectually disabled, as defined by the American Association for Intellectual
 and Developmental Disabilities
 
 [13]
 
 and/or the American Psychiatric Association.
 

 Id.
 

 This element requires proof of three interrelated criteria: (1) significant subaverage intellectual functioning ("Criterion A"), (2) significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety ("Criterion B"), and (3) onset before age eighteen ("Criterion C").
 

 Id.
 

 at 1028
 
 (quoting
 
 Atkins v. Virginia
 
 ,
 
 536 U.S. 304
 
 , 308 n.3,
 
 122 S.Ct. 2242
 
 ,
 
 153 L.Ed.2d 335
 
 (2002) ). And second, the defendant must prove that he or she is not malingering.
 
 [14]
 

 Id.
 

 Again, it is the burden of the petitioner, and not the State, to prove each of these elements.
 

 ¶ 35. Proving these elements likely will require the defendant to undergo certain psychological tests, such as IQ tests or achievement tests.
 
 See, e.g.
 
 ,
 
 Chase
 
 ,
 
 873 So.2d at 1028
 
 (quoting Diagnostic and Statistical Manual of Mental Disorders 42-43 (4th ed. 2000)) (noting that an IQ score of 75 typically is considered the cutoff score for the intellectual-functioning prong of intellectual disability). But in some cases, and specifically with regard to adaptive functioning under Criterion B, it may not be appropriate to administer any standardized tests to the defendant. For example, in
 
 Thorson v. State
 
 ,
 
 76 So.3d 667
 
 , 672 (Miss. 2011), the forensic team at the State Hospital-including Dr. Macvaugh-specifically noted that it had not administered any standardized adaptive-functioning tests to the defendant because "retrospective testing for adaptive functioning is not standardized for use with offenders who have been incarcerated for a number of years." As such, an assessment of a defendant's adaptive functioning may include "interviewing family and friends knowledgeable about the defendant's past," "interviews with educators or others in the community familiar with the defendant's behavior before age eighteen," and "a thorough review of school records, social history, and work history, among other things," which may not require direct contact with or testing of the defendant.
 
 Goodin v. State
 
 ,
 
 102 So.3d 1102
 
 , 1115 (Miss. 2012).
 

 ¶ 36. Here, the trial court considered the State's motion to evaluate Russell under Rule 35 of the Mississippi Rules of Civil Procedure, which authorizes the trial court to order an individual to undergo a physical or mental examination if that person's physical or mental condition is "in controversy." Miss. R. Civ. P. 35(a). An order under Rule 35"may be made only on motion for good cause shown ...."
 

 Id.
 

 The State does not object to the trial court's reliance on this standard, and the majority does not mention it. I note, however, that Rule 35 imposes the same good-cause standard as the discovery provision of the Uniform Post-Conviction Collateral Relief Act.
 
 See
 

 Miss. Code Ann. § 99-39-15
 
 (1) (Rev. 2015) ("A party may invoke the processes of discovery available under the Mississippi Rules of Civil Procedure ... if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."). Applying this standard, we
 must find that the State had shown good cause justifying additional psychological testing of Russell in order to conclude that the trial court abused its discretion in denying the State's motion. To do so, we must compare the State's two
 
 [15]
 
 specific requests-intelligence testing and adaptive-functioning testing-to the evidence already available to the trial court, keeping in mind the elements that must be proved in an
 
 Atkins
 
 case.
 

 I. Intellectual Functioning
 

 ¶ 37. This Court has held that a defendant may satisfy Criterion A of the definition of intellectual disability by presenting evidence that he or she has a full-scale IQ score of 75 or lower.
 
 Chase
 
 ,
 
 873 So.2d at 1029
 
 . Similarly, the United States Supreme Court recently found that a defendant's IQ score of 74 satisfied Criterion A and required the lower court to "move on to consider [the defendant's] adaptive functioning" under Criterion B.
 
 Moore v. Texas
 
 , --- U.S. ----,
 
 137 S.Ct. 1039
 
 , 1049,
 
 197 L.Ed.2d 416
 
 (2017).
 
 See also
 

 Chase
 
 ,
 
 873 So.2d at 1028
 
 (finding that Criterion A may be satisfied by a full-scale IQ score of 75 or below). The
 
 Moore
 
 Court reached this determination based solely on the results of an IQ test administered to the defendant in 1989, even though the defendant's
 
 Atkins
 
 hearing was held in 2014 and the defendant had taken more recent IQ tests.
 

 Id.
 

 Here, Russell presented the trial court with two prior IQ scores, both of which satisfied Criterion A. In 1989, prior to his capital-murder trial, Russell was administered the WAIS-R, and he produced a full-scale score of 68. And in 2006, Russell was administered the WAIS-III by Dr. Macvaugh, and he produced a full-scale score of 75. Dr. Macvaugh testified that the WAIS-III was the "gold standard" IQ test at the time it was administered to Russell.
 
 See also
 

 Atkins
 
 ,
 
 536 U.S. at
 
 309 n.5,
 
 122 S.Ct. 2242
 
 (identifying the WAIS-III as "the standard instrument in the United States for assessing intellectual functioning"). Accounting for the Flynn Effect, which both of the experts in this case considered a valid statistical adjustment,
 
 [16]
 
 Russell's scores on those tests would be lowered to 66 and 72, respectively. Thus, the psychological testing already available to the trial court established that Russell satisfied Criterion A.
 

 ¶ 38. The State complains that the trial court could not perform a "complete"
 
 Atkins
 
 evaluation without allowing Dr. Macvaugh to administer the WAIS-IV, the successor to the WAIS-III. To be clear, the WAIS-IV is the
 
 only
 
 specific psychological test Dr. Macvaugh identified as necessary to reach an opinion on Russell's
 
 Atkins
 
 claim. However, Dr. Macvaugh testified that the WAIS-R and the WAIS-III were the most up-to-date IQ tests available at the time they were administered to Russell. In fact, Dr. Macvaugh personally administered the WAIS-III to Russell, and he stated that he did not doubt the validity of Russell's score on that test:
 

 Q: So you're not saying you need to give him a WAIS-IV because the WAIS-III you already gave him
 should not be considered a valid estimate of his true intellectual ability.
 

 A: Definitely not saying that, no.
 

 Dr. Macvaugh also testified that Russell's score on the WAIS-III was "certainly among the data points that I would seriously consider in my conceptualization of whether Mr. Russell has mental retardation." This testimony is supported by the reports from Russell's 2006 evaluations, which state that Dr. Macvaugh "explained to Mr. Russell that the results of the intelligence testing could potentially be used to argue whether or not he should receive the death penalty." And finally, Dr. Macvaugh opined that, in his experience, individuals usually produce lower scores on the WAIS-IV than the WAIS-III.
 

 ¶ 39. In determining whether good cause existed to order Russell to undergo an additional IQ test administered by the State's expert, the trial court had to consider two existing IQ scores proving that Russell was within the range that satisfied the intellectual-functioning prong of intellectual disability. The State presented no evidence suggesting that those scores were invalid or that they could not be used in an
 
 Atkins
 
 analysis. The only reason offered by the State in support of administering the WAIS-IV was that it was a newer test based on more recent scientific data. But in the State's own expert's opinion, Russell probably would produce a lower score on the WAIS-IV than he did on the WAIS-III. In denying the State's motion for an evaluation, the trial court did not place the State in an "impossible position," as the majority complains. Instead, the trial court correctly weighed the need for additional intelligence testing against the existing evidence of Russell's intellectual functioning, along with the risk of testing error, and determined that the State had not shown good cause to conduct additional testing. Under these facts, I would not find that the trial court abused its discretion in denying the State's request to have its own expert administer the WAIS-IV to Russell.
 

 II. Adaptive Functioning
 

 ¶ 40. The second requirement for a diagnosis of intellectual disability is "significant limitations in adaptive functioning in at least .... two skill areas ...."
 
 Chase
 
 ,
 
 873 So.2d at 1021
 
 (quoting
 
 Atkins
 
 ,
 
 536 U.S. at
 
 308 n.3,
 
 122 S.Ct. 2242
 
 ). Formal adaptive-functioning tests are not standardized for individuals who have been incarcerated for long periods of time, because they are designed to test an individual's ability to perform certain tasks and live independently outside of the prison community.
 
 See
 

 Thorson
 
 ,
 
 76 So.3d at 672
 
 . Therefore, as previously mentioned, an evaluation of an
 
 Atkins
 
 defendant's adaptive functioning generally requires an evaluation of other sources of evidence, such as academic records, employment records, and interviews with individuals who knew the defendant prior to age eighteen.
 
 See
 

 Goodin
 
 ,
 
 102 So.3d at 1115
 
 .
 

 ¶ 41. Here, the trial court had access to the transcript of Russell's three-hour clinical interview at the State Hospital in 2006. Dr. Macvaugh was present for this interview. The interview covered a wide range of topics, including Russell's family history, academic history, employment history, and medical history. The report from this interview clearly states that "information from this evaluation could be used to assist the Court in assessing whether or not [Russell] is mentally retarded and therefore eligible or not eligible for the death penalty." Russell also was administered the WRAT-4, an academic achievement test, in 2006, and he produced scores ranging from third-grade to sixth-grade equivalency, which were consistent with his IQ
 

 socres. The WRAT can be used to assess a person's adaptive functioning in the area of functional academics and has been relied on by experts in several previous
 
 Atkins
 
 cases in Mississippi.
 
 See
 

 Chase v. State
 
 ,
 
 171 So.3d 463
 
 (Miss. 2015) ;
 
 Thorson v. State
 
 ,
 
 76 So.3d 667
 
 (Miss. 2011) ;
 
 Doss v. State
 
 ,
 
 19 So.3d 690
 
 (Miss. 2009) ;
 
 Spicer v. State
 
 ,
 
 973 So.2d 184
 
 (Miss. 2007). As with the WAIS, the State did not present any evidence suggesting that a WRAT would be administered differently as part of an "
 
 Atkins
 
 evaluation" as opposed to a competency or sanity evaluation. In addition, the WRAT-4 remains the most current version of the WRAT, so the State cannot complain that Russell's scores on the WRAT-4 are "outdated."
 

 ¶ 42. At the hearing on the State's motion to evaluate Russell, the State began its argument by conceding that "there are no measures for adaptive functioning." Dr. Macvaugh confirmed, "It's difficult to assess an individual's skills using traditional assessment measures, measures designed to assess for adaptive behavior, because the opportunities for a death row inmate to engage in those kinds of behaviors are not available based on what those measurements attempt to measure." Dr. Macvaugh did state that other measures can be used to assess adaptive functioning, such as "interview kinds of tasks, additional kinds of psychometric testing, and review-extensive review of the previous history, especially before age 18." However, aside from the general statement that he "probably also would be administering some kinds of adaptive behavior tasks ...," Dr. Macvaugh was unwilling to divulge any specific measure that he would use to evaluate Russell, explaining that he had not determined what types of assessments would need to be administered. Dr. Macvaugh stated that he might administer a money-management subtest of the Independent Living Scales, but as pointed out by the trial court, that test had not been normed for prison inmates, and Russell had been asked numerous questions related to money management during his 2006 interview.
 

 ¶ 43. In reviewing the State's motion to evaluate Russell, the trial court was tasked with determining whether additional psychological testing of Russell was necessary to reach a conclusion on his adaptive functioning under Criterion B, in light of the existing evidence that was relevant to that issue. Based on Dr. Macvaugh's own admission that standardized adaptive-functioning assessments are not normed for prison inmates like Russell, along with Dr. Macvaugh's refusal to point to any specific test that he would administer to Russell, I would find that the trial court did not abuse its discretion in denying the State's motion to evaluate Russell. Dr. Macvaugh stated that "interview kinds of tasks" can be used to assess adaptive functioning, but Russell had already undergone an extensive clinical interview, and Dr. Macvaugh did not explain why that interview could not be used for the purposes of an adaptive-functioning assessment. Dr. Macvaugh also mentioned that a thorough review of Russell's previous history would be necessary, but such a review would not require psychological testing of Russell. While the majority does not address the substantive issue of Russell's intellectual disability, it is important to note that Russell presented the trial court with his academic records from kindergarten through twelfth grade, along with his scores on several standardized achievement tests. Additionally, Russell's expert witness either interviewed or reviewed the written statements of twenty-three witnesses who had known Russell as a child or young adult, including his family members, classmates, neighbors, teachers, coaches, and co-workers. Dr. Macvaugh acknowledged the importance of this type of evidence to
 an adaptive-functioning analysis, stating, "we think it's important to attempt to collect collateral data from those types of individuals who knew the individual about whom the assessment is being conducted to collect those types of adaptive behavior data." But the State did not need to subject Russell to psychological testing to gain access to this evidence. Accordingly, I would affirm the trial court's denial of the State's request to evaluate Russell's adaptive functioning.
 

 CONCLUSION
 

 ¶ 44. Because the trial court acted within its discretion in finding that the State had not shown good cause to subject Russell to additional psychological testing, I respectfully dissent. I would affirm the trial court's denial of the State's motion to evaluate Russell.
 

 KITCHENS, P.J., KING AND COLEMAN, JJ., JOIN THIS OPINION.
 

 At the time
 
 Chase
 
 was decided, this organization was called the American Association on Mental Retardation.
 
 Chase
 
 ,
 
 873 So. 2d at 1029
 
 .
 

 Chase
 
 specifically mentioned the Minnesota Multiphasic Personality Inventory-II (MMPI-II) as a test designed to detect malingering, but this Court more recently has clarified that it neither endorses the MMPI-II as the best test nor requires it to be given.
 
 Lynch v. State
 
 ,
 
 951 So.2d 549
 
 , 557 (Miss. 2007)
 

 The State also alleged that additional malingering testing was necessary. But Russell was administered malingering instruments in conjunction with his IQ tests in 1989 and 2006, and he was not malingering on either occasion. Because the purpose of a malingering instrument is to ensure the validity of other psychological tests, additional malingering testing would be necessary in this case only if the trial court allowed the State to administer other psychological tests to Russell.
 

 Dr. Macvaugh also testified that Russell's score on the WAIS-IV would have to be adjusted to account for the Flynn Effect, if he were ordered to take that test.