# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-DP-01489-SCT

*LISA JO CHAMBERLIN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/04/2006 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL ADELMAN |
| | GAY POLK-PAYTON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PAT McNAMARA |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | JON MARK WEATHERS |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 07/17/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.   Lisa Jo Chamberlin was convicted and sentenced to die by lethal injection for the capital murders of Linda Heintzelman and Vernon Hullett during the commission of a robbery.  Chamberlin appeals her convictions and sentence.

## FACTS

¶2.   The investigation into this gruesome double murder began when Kansas authorities received a report that the defendant Lisa Jo Chamberlin and her boyfriend and co-defendant,

Roger Gillett, were in possession of a stolen vehicle and were manufacturing methamphetamine at the Gillett farm in Russell County, Kansas.

¶3.  Based on the information received, Kansas Bureau of Investigation (KBI) Officer Matthew Lyon obtained two search warrants.  One warrant authorized the search of 606 North Ash, where Gillett and Chamberlin were staying, and the second warrant authorized the search of the Gillett farm.

¶4.  On March 29, 2004, at 3:45 p.m., officers  began a search at 606 North Ash.  Lyon and other KBI officers participated in the search.  The search was completed at 5:05 p.m. KBI officers found Gillett and Chamberlin, as well as methamphetamine and other drug paraphernalia, at 606 North Ash.  KBI officers arrested Gillett and Chamberlin that day. Chamberlin was detained at the Russell County Jail.

¶5.  At approximately 5:13 p.m. on March 29, Lyon attempted to interview Chamberlin. After Lyon read Chamberlin her *Miranda*[1] rights, Chamberlin told Lyon that she did not want to answer any questions.  The interview ended at approximately 5:20 p.m.  Only identifying questions were asked and answered in that interview.

¶6.  Chamberlin was charged with a number of drug-related offenses.  Meanwhile, at approximately 5:15 p.m., other officers began  to search the Gillett farm.  At the farm, the first officers to arrive discovered a white Dodge Dakota pickup truck with Mississippi plates

---

[1]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

parked in a metal shed and a white freezer that was taped shut with duct tape and plugged in inside a wooden granary.

¶7.    Upon opening the freezer, the officers discovered a dismembered body, later identified as Vernon Hullett, and a black plastic trash bag which contained severed body parts. The officers secured the premises while they sought and obtained a third search warrant. Armed with this third search warrant, which authorized the officers to search for evidence in connection with the murder investigation, the officers returned to the Gillett farm, pulled the male body out of the freezer and discovered another body frozen in a liquid in the bottom of the freezer. The officers thawed the contents of the freezer and extracted a second body, later identified as Linda Heintzelman. The search at the farm was completed the next day, March 30, at 5:22 p.m.

¶8.    On the evening of March 29, Officer Lyon received a call from the Russell County Sheriff advising him that two bodies had been found at the Gillett farm. Officers conducted three interviews with Chamberlin during the course of the day on March 30.

¶9.    At the end of Chamberlin's last interview on the  afternoon on March 30, she agreed to show KBI Officer Delbert Hawel the location where she and Gillett had dumped evidence at the landfill in Russell. At approximately 8:00 p.m., KBI Officer Max Barrett, Hawel, and Chamberlin rode to the Russell County dump, and Chamberlin indicated where some of the physical evidence from the murders had been deposited. The landfill was secured until it could be searched. Barrett testified that later that evening, after returning to the sheriff's office, he was contacted by one of the corrections officers who told him that Chamberlin

wanted to talk to a KBI agent. Since the KBI agents had left for the evening, Chamberlin indicated that she would talk with Barrett. Barrett testified that when he spoke with Chamberlin she expressed her desire to talk to one of the agents, and he relayed her request to an agent.

¶10. The next day, March 31, officers returned to the dump and recovered seven plastic trash bags, containing, among other things, one of Hullett's work shirts, pants with Hullett's name on them, a pillow heavily stained with blood, a camera, a purse containing identification which apparently belonged to Heintzelman, a wallet and identification that belonged to Hullett, a Hattiesburg, Mississippi, phone book, and the cardboard center of a roll of duct tape. Barrett packaged the evidence and transferred it to Hattiesburg Police Officer Rusty Keyes.

¶11. During the three interviews on March 30 and the interview on the morning of March 31, Chamberlin explained her relationship with Gillett and her participation in the robbery and murders of Hullett and Heintzelman. Chamberlin met Gillett in Oregon, where she was born and raised. They lived together for a brief time in Oregon before they moved to Russell, Kansas, where they lived with some of Gillett's relatives. Around the beginning of March, Chamberlin and Gillett drove from Russell County, Kansas, to Hattiesburg, Mississippi, where they stayed with Gillett's cousin, Vernon Hullett, and his live-in girlfriend, Linda Heintzelman. On March 6, shortly after arriving in Hattiesburg, Gillett and Chamberlin wrecked their car while following Hullett and Heintzelman in Heintzelman's pickup truck on Highway 49. According to Chamberlin, Heintzelman changed lanes too closely in front

4

of their vehicle, causing them to run into the rear of Heintzelman's truck. Gillett's car was badly damaged, but Heintzelman's truck sustained only minor damage.

¶12. According to Chamberlin, Heintzelman promised to report the accident as a claim against her insurance and then divide the insurance proceeds with Chamberlin and Gillett. Heintzelman never submitted the accident report to her insurance company.

¶13. Chamberlin told KBI officers that on an unknown date in March 2004, she, Gillett, Hullett, and Heintzelman were all at Hullett's residence. Hullett and Heintzelman suggested that Gillett and Chamberlin get their own place to live. Chamberlin agreed, but Gillett wanted to stay at Hullett's. Chamberlin and Gillett argued about moving. Unable to drive her car in its damaged condition, Chamberlin left on foot and returned that evening to find Gillett standing on the front porch smoking a cigarette.

¶14. When Chamberlin and Gillett entered the house, Gillett became violent with Heintzelman, accusing her of not being truthful about reporting the accident to her insurance company. Gillett instructed Chamberlin to get his gun from under the mattress in the bedroom. Chamberlin complied. Chamberlin and Gillett cut the telephone wires so that Hullett and Heintzelman could not call the police. Gillett fired one round inside the house to scare Hullett and Heintzelman.

¶15. Gillett punched and hit Hullett several times in an attempt to get the combination to Hullett's safe. Upon discovering that all the beer in the house had been consumed, Chamberlin left again to get more beer. When Chamberlin returned, Heintzelman was bent over the safe and was not wearing any pants. Chamberlin inquired as to whether Gillett had

5

raped Heintzelman. Gillett explained that he wanted to "break her," so he made her take her clothes off and used a beer bottle to rape her. Still unsuccessful in opening the safe, Chamberlin became impatient and told Gillett something similar to "let's just kill them and get out of here."

¶16. According to Chamberlin, Gillett bashed Hullett in the head with a hammer while Hullett was sitting in a chair in the living room. Gillett also slashed Hullett's throat. Chamberlin went out of the house and came back in a number of times over several hours while Heintzelman was lying on the floor, injured but "still breathing." Eventually, Chamberlin suggested that they smother Heintzelman. Chamberlin and Gillett worked together to bind Heintzelman's hands behind her back so that she could not struggle with them. Gillett lifted Heintzelman's head, and Chamberlin placed a bag over it. Chamberlin told the officers that she was unable to complete the asphyxiation of Heintzelman and went outside. She said that Heintzelman was still breathing when she went outside, but when she returned, Heintzelman was dead.

¶17. Chamberlin told the officers that she assisted in cleaning up the murder scene. She helped move the bodies to the bathroom, where Gillett cut off Hullett's head and arms and she held garbage bags open while Gillett placed Hullett's arms inside the bags. Chamberlin described how she assisted in loading Heintzelman's body and then Hullett's body, along with the black trash bag, into the freezer and how she taped the freezer shut as Gillett stood on top of the freezer to hold it closed. Chamberlin and Gillett took Hullett's pickup truck and transported the freezer containing the two bodies on the back of that truck from Hullett's

6

house to Kansas. After arriving in Kansas, they unloaded the freezer and plugged it in at the Gillett farm. She indicated that they took the items they transported from Hullett's house and disposed of them at the Russell dump. Also, she agreed to cook some methamphetamine for five hundred dollars because they needed money. She described how they discarded the trash from making methamphetamine at the public swimming pool and how on the next day she and Gillett were arrested.

¶18. During trial, Dr. Donald Pojman, who performed the autopsies on Hullett and Heintzelman, testified that the cause of Heintzelman's death was from "[s]harp-force injuries of the torso and the neck," "blunt-force injuries of the head," and "asphyxiation," and that the cause of Hullett's death was blunt-force injuries to the left side of the head.

## PROCEDURAL HISTORY

¶19. Chamberlin and Gillett were jointly indicted on two counts of capital murder in the deaths of Heintzelman and Hullett. The court granted Chamberlin's motion for severance from Gillett.

¶20. Chamberlin filed a motion to suppress the evidence recovered from the Russell landfill as well as a motion to suppress her statements. At the suppression hearing, three KBI officers, Lyon, Hawel, and Kelly Ralston, testified that they interviewed Chamberlin a total of five times, and in those interviews, Chamberlin admitted her participation in the murders. Two officers from the Hattiesburg Police Department, Rusty Keyes and Terrell Carson, testified that upon arrival in Hattiesburg, Chamberlin refused to make a statement and requested a lawyer. Also, two jailmates of Chamberlin's at the Forrest County Jail, Martha

7

Petrofsky and Marilyn Coleman, testified at the suppression hearing. Petrofsky and Coleman, both housed in the one-room detention area where Chamberlin was detained, testified that Chamberlin admitted to participating in the murders of Hullett and Heintzelman. Chamberlin did not present evidence at the suppression hearing. The trial court entered an order denying Chamberlin's motion to suppress statements.

¶21. During trial, Chamberlin did not put on any evidence. After the three-day trial, the jury found Chamberlin guilty on two counts of capital murder. During sentencing, Chamberlin called two former jail mates as character witnesses. She also called a psychologist appointed by the court to investigate any mitigating factors in relation to her mental state. The psychologist testified as to information she obtained from interviewing Chamberlin and people who knew her, including Chamberlin's mother, Twila Speer; Chamberlin's aunt, Loma Wagner; and a long-time friend from childhood, Veronica, among others. At the conclusion of the sentencing phase, in accordance with the recommendation of the jury, the court ordered Chamberlin to be put to death by lethal injection. The trial court stayed Chamberlin's execution pending resolution of her Motion for Judgment Notwithstanding the Verdict, or in the Alternative, Motion for a New Trial, and her appeal to this Court. The trial court denied Chamberlin's post-trial motions, and Chamberlin timely appealed to this Court.

## DISCUSSION

¶22. The thoroughness and intensity of review are heightened in cases in which the death penalty has been imposed. *Ross v. State*, 954 So. 2d 968, 986 (Miss. 2007); *Laney v. State*,

8

421 So. 2d 1216, 1217 (Miss. 1982). What may be harmless error in a case with a lesser sentence becomes reversible error when the penalty is death. *Ross*, 954 So. 2d at 986; *Laney*, 421 So. 2d at 1217. Under this standard of review, all doubts are to be resolved in favor of the accused. *Lynch v. State*, 951 So. 2d 549, 555 (Miss. 2007).

## PRE-TRIAL

I. **WHETHER THE TRIAL COURT ERRED IN ADMITTING THE STATEMENTS MADE DURING CUSTODIAL INTERROGATIONS.**

¶23. In the course of five interviews conducted by the KBI, Chamberlin repeatedly admitted to participating in the murders of Hullett and Heintzelman. Claiming that KBI officers violated her right to counsel and her right to remain silent, Chamberlin moved for suppression of statements she made during the second, third, fourth, and fifth interviews with KBI officers.

**First Interrogation.**

¶24. Lyon testified that he began an interview with Chamberlin on March 29, 2004, at approximately 5:13 p.m. Lyon, unaware of the homicides at the time of this first interrogation, initially was solely concerned with the narcotics investigation which had resulted in Chamberlin's arrest.

¶25. Lyon began by asking preliminary identification questions. Chamberlin claims that about one minute into the interview she stated, "I won't tell you anything until I talk to a lawyer." The State contends that Chamberlin asked, "Is this where I'm supposed to ask for

9

a lawyer," and later "Don't you think I need a lawyer?"[2] The videotape of the interrogation shows that Chamberlin made an unintelligible statement, and Lyon immediately asked questions to clarify whether Chamberlin had invoked her right to counsel. Subsequently, Chamberlin clearly said, "I'll talk."

¶26.    This first interview lasted about six minutes. Lyon testified that after he read Chamberlin her *Miranda* rights, she "checked [on a *Miranda* form] that she did not want to speak with [him]." The interview concluded at approximately 5:20 p.m.

**Second Interrogation.**

¶27.    After finding unidentified bodies at the Gillett farm, Hawel, along with Lyon, interrogated Chamberlin on the morning of March 30, 2004. This interview began at approximately 9:43 a.m. Approximately sixteen hours after the first interview, Lyon, for the second time, and Hawel, for the first time, interviewed Chamberlin, focusing solely on the bodies found at the farm. Hawel read Chamberlin her *Miranda* rights at the beginning of the interview, and she signed and initialed a waiver, witnessed by Hawel and Lyon. The interview was not recorded on video but was memorialized by Hawel's notes and investigation report. According to the report, Chamberlin described Hullett's and Heintzelman's dead bodies in the living room of Hullett's home, injuries to Hullett's neck, her assistance in cleaning the house and loading the bodies in the freezer, the arrangement

---

[2]Chamberlin clearly mentions "an attorney" on the tape, but from a review of the tape, it cannot be determined exactly what she said. Chamberlin did not testify at either the suppression hearing or the trial.

10

of the bodies in the freezer and the inclusion of a black plastic trash bag in the freezer. This interview ended at approximately 10:39 a.m. There is no evidence that Chamberlin invoked her *Miranda* rights during this interview.

**Third Interrogation.**

¶28. Agents Hawel and Lyon initiated a third interview later in the afternoon on March 30, beginning about 1:24 p.m. This interview was videotaped. Chamberlin was reminded of her *Miranda* rights by reference to the same waiver she signed and initialed in the interview earlier that morning, and she confirmed that she understood.

¶29. During this interview, Chamberlin was very emotional, intermittently crying and apologizing to Roger. Chamberlin began to relay the details of the day of the murders but then began to ramble. Chamberlin did not provide any details of the murders during this interview, which concluded at 1:39 p.m.

**Fourth Interrogation.**

¶30. Hawel and Ralston conducted a fourth interview, beginning at approximately 2:46 p.m. that same afternoon. Ralston testified that he was present when Hawel, before beginning the interview, reviewed with Chamberlin her *Miranda* rights and she acknowledged that she understood her rights and said that she wanted to speak with him. Ralston memorialized this interview in a report. The report indicates that Chamberlin described the details of the murders "from start to finish, " including Gillett bashing Hullett in the head with a hammer, the dismemberment of Hullett and finally the placement of the bodies in the freezer where they were found. Chamberlin also spoke in detail about how she helped tape Heintzelman's

11

hands behind her back so she would not struggle with Chamberlin and Gillett as they began suffocating her with a plastic bag, a process which Gillett completed. Chamberlin told Hawel that she would notify him if she recalled anything else. The report indicates that the interview concluded with Chamberlin's last statement that she would show Hawel where the trash was dumped inside the Russell landfill.

**Fifth Interrogation.**

¶31. On March 31, Hawel testified that he was contacted by officer Barrett, who stated that Chamberlin desired to talk with a KBI agent. Barrett testified that "[Chamberlin] wanted to talk to someone and she asked to speak to one of the KBI agents. They weren't there, so she asked to speak to me." Barrett passed the information on to a KBI agent.

¶32. Hawel sent for Chamberlin and asked her whether she wanted to talk to him, and she answered in the affirmative. Hawel and Ralston videotaped the fifth interview, which began at approximately 9:43 a.m. Hawel informed Chamberlin of her *Miranda* rights, and Chamberlin signed a waiver. Chamberlin then gave a detailed account from the day of the murders, including her involvement, through her arrest in Kansas.

**Analysis.**

¶33. Chamberlin alleges that she invoked her Fifth-Amendment right to counsel during the first interview and consequently, the KBI officers violated her right when they reinitiated the interviews with her the next day. She argues that all statements made after the first interview should be suppressed. The State argues that Chamberlin's right to counsel was not violated

12

because she made an ambiguous request for counsel, and Lyon appropriately asked clarifying questions.

¶34.   Findings by a trial judge that a defendant confessed voluntarily, and that such confession is admissible are findings of fact. *Davis v. State*, 551 So. 2d 165, 169 (Miss. 1989).  As long as the trial judge applies the correct legal standards, his decision will not be reversed on appeal unless it is manifestly in error, or is contrary to the overwhelming weight of the evidence. *Davis*, 551 So. 2d at 169 (citing *Frost v. State*, 483 So. 2d 1345, 1350 (Miss. 1986); *White v. State,* 495 So. 2d 1346, 1347 (Miss. 1986)).

¶35.   The Fourteenth Amendment incorporates the Fifth-Amendment privilege against self-incrimination.  The United States Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), that the privilege extends to state custodial interrogations.  The *Miranda* warning requires that, before subjecting a person in police custody to interrogation, law enforcement officers must inform the person that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. *Miranda*, 384 U.S. at 444. Once this warning has been given, if the person in custody "indicates in any manner, at any time prior to or during questioning**,** that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74.  Any statement taken after such an indication is the product of compulsion. *Id.* at 474.  The administration of the *Miranda* warnings and a waiver, or a fully effective equivalent, constitute the prerequisites to the admissibility of any statement made by a defendant. *Id.* at 476. The State has the burden of proving all facts

13

prerequisite to admissibility beyond a reasonable doubt. *Davis*, 551 So. 2d at 169 (citing *Jones*, 461 So. 2d 686, 694 (Miss. 1984); *Gavin*, 473 So. 2d 952, 954 (Miss. 1985)).

¶36.    If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. *Miranda*, 384 U.S. at 474; *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). In determining whether a defendant's right to counsel has been violated, this Court must consider two things. *Holland v. State*, 587 So. 2d 848, 856 (Miss. 1991) (citing *Edwards*, 451 U.S. at 482); *Berry v. State*, 575 So. 2d 1, 5 (Miss. 1990). First, it must determine whether the defendant actually invoked his right to counsel. *Holland*, 587 So. 2d at 856; *Davis v. United States*, 512 U.S. 452, 458, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). If the defendant invoked this right, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85.

¶37.    A defendant's request for counsel must be interpreted broadly "whether the defendant's request is explicit or equivocal." *Holland*, 587 So. 2d at 856 (citing *Towne v. Dugger*, 899 F.2d 1104, 1106 (11th Cir. 1990) (quoting *Michigan v. Jackson*, 475 U.S. 625, 633, 106 S.Ct. 1404, 1406, 89 L.Ed.2d 631, 640 (1986))). However, "[t]he likelihood that a suspect would wish counsel to be present is not the test for applicability of *Edwards.*" *Davis*, 512 U.S. at 459 (citing *McNeil v. Wisonsin*, 501 U.S. 171, 178, 115 L. Ed. 2d 293, 110 S. Ct. 1176 (1990)). Determining whether a defendant invoked his right to counsel is an objective inquiry. *Davis*, 512 U.S. at 459 (citing *Connecticut v. Barrett*, 479 U.S. 523,

14

529, 93 L. Ed. 2d 920, 107 S. Ct. 828 (1987)). "Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis*, 512 U.S. at 459 (citing *McNeil*, 501 U.S. at 178) (internal quotation marks omitted). A defendant must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. The Supreme Court explained in *Davis* that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* (emphasis in original).

¶38. This Court previously has held that if an officer understands only that the suspect *might* be invoking the right to counsel, an officer must cease interrogation, except for inquiries made to clarify the defendant's request. *Holland*, 587 So. 2d at 856 (emphasis added). The United States Supreme Court declined to require such a procedure but noted in *Davis* that where the officers followed the same procedure as adopted by this Court, such a procedure is "good police practice for the interviewing officers." *Davis*, 512 U.S. at 461.

¶39. A review of the video recording of the first interrogation shows that Lyon was in the midst of asking identification questions when Chamberlin, after spelling her last name, blurted out the unintelligible statement regarding an attorney. Lyon then ceased his series of identifying questions and asked Chamberlin a number of questions, pertaining only to whether she wanted an attorney. Eventually, Chamberlin said, "I'll talk." The trial court

15

found that "her questions concerning an attorney were ambiguous as a matter of law and that investigators took all appropriate precautions to determine the nature and extent of the ambiguity, and that the defendant voluntarily and without coercion agreed to proceed and further answer questions." This Court agrees.

¶40. After the clarifying questions and Chamberlin's response that she would talk, Lyon advised Chamberlin of her *Miranda* rights, and she acknowledged that she understood. When Lyon asked Chamberlin "are you willing to answer questions now," Chamberlin shook her head "no," and Lyon ceased asking questions. Chamberlin's indication that she did not want to answer questions did not constitute an unambiguous request for counsel. Thus, at the end of the first interrogation, she successfully invoked her right to silence but not her right to counsel. This Court finds, as the trial court did, that Chamberlin's *Miranda* rights were fully respected during the first interview.

¶41. According to Hawel's report, Chamberlin admitted involvement in the murders during the second interrogation. Chamberlin asserts that this statement should have been suppressed, because she invoked her right to silence at the end of the first interview.

¶42. The admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975). The government may, however, use statements which are given voluntarily by the defendant after he receives full disclosure of the rights offered by *Miranda*. *Michigan*

16

*v. Tucker*, 417 U.S. 433, 450, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974). When a defendant alleges a violation of her privilege against self-incrimination, the trial court must determine, in consideration of the totality of the circumstances, whether or not the confession was made voluntarily, and whether there was a knowing and voluntary waiver of the accused's privilege against self-incrimination. *Davis*, 551 So. 2d at 169 (citing *Gavin v. State*, 473 So. 2d 952, 954 (Miss. 1985); *Jones v. State*, 461 So. 2d 686, 696 (Miss. 1984)).

¶43.    Invocation of the right to counsel is a rigid, prophylactic rule which prohibits further questioning until an attorney is made available or the defendant knowingly and voluntarily waives his right. *See Edwards*, 451 U.S. 477. On the other hand, invocation of the right to silence concerns whether an officer scrupulously honors a defendant's right to cease questioning for a reasonable time, after which questioning may resume if the defendant knowingly and voluntarily waives this right. *See Neal v. State*, 451 So. 2d 743, 755 (Miss. 1984).

¶44.    No passage in "the *Miranda* opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Mosley*, 423 U.S. at 102-103. The officer's initiation of the second interrogation did not violate Chamberlin's *Miranda* rights when it was undisputed that a significant period of time had passed from the first interrogation (about sixteen hours). New *Miranda* warnings were administered and a waiver signed; and the interrogation was restricted to the murders, which had not been a

17

subject of the first interrogation. *See Mosley*, 423 U.S. at 106. Further, Chamberlin makes no argument or puts forth any evidence that she invoked her right to remain silent in the second interrogation. Hawel read Chamberlin her *Miranda* rights; Chamberlin signed and initialed a waiver; and there is no indication that Chamberlin invoked any of her *Miranda* rights. The trial court found that the State had met the *Mosley* guidelines. This Court agrees. Therefore, the statements obtained in the second interrogation were properly obtained and admitted.

¶45. Similarly, the initiation of the third interrogation by the KBI officers was proper. During the third interrogation, Chamberlin did not make a statement concerning her involvement in the murders. However, she became very emotional and indicated that she no longer wanted to answer questions, and Hawel properly ceased questioning. Therefore, the concern with the third interrogation is not whether a statement made therein was admissible but, rather, the effect of Chamberlin's invocation of her right to silence on the statements obtained in the fourth and fifth interviews.

¶46. As to the initiation of the fourth interview, this Court must again answer the question put forth in *Neal*, 451 So. 2d at 749, 751. "Once an accused states that he wishes questioning to cease, when and under what circumstances may law enforcement authorities resume interrogation and obtain an admissible inculpatory statement?" *Neal*, 451 So. 2d at 754. In *Neal*, this Court held that "[n]otwithstanding an earlier valid waiver of his privilege against self-incrimination and his right to counsel, an accused may revoke that waiver." *Johnson v.*

18

*State*, 512 So. 2d 1246, 1252 (Miss. 1987) (quoting *Neal*, 451 So. 2d at 755), *overruled in part by Smith v. State*, No. 2006-KA-02149-SCT, 2008 Miss. LEXIS 339 (Miss. June 26, 2008). Any revocation must be scrupulously honored. *Neal*, 451 So. 2d at 755. However, "[w]here . . . following the revocation the accused is re-advised of his *Miranda* rights, if he thereafter knowingly, intelligently and voluntarily re-waives those rights, any subsequent inculpatory statement may be received in evidence against him." *Id.*

¶47. Chamberlin waived her *Miranda* rights at the beginning of the third interview. She then revoked that waiver by stating that she was unable to continue. Accordingly, Hawel stopped the interview. Later that afternoon, a *Miranda* warning was re-administered, and she re-waived her rights. Due to the undisputed evidence that she knowingly, intelligently, and voluntarily waived her rights at the beginning of the fourth interrogation, the initiation of the fourth interrogation by the KBI officers was proper, and her subsequent inculpatory statements were admissible in evidence against her. The trial court found that "Chamberlin's rights were sufficiently safeguarded during this colloquy and that all statements made therein were made after intelligently, knowingly, and voluntarily waiving her rights." This Court agrees. The trial court properly admitted the statements obtained in the fourth interview.

¶48. As for the fifth interview, the State submitted at the suppression hearing undisputed evidence that Chamberlin initiated that interview. The trial court found that "Chamberlin initiated the final interview by sending a message through the jailer that she wished to speak

to the authorities again. The interview of March 31, 2004, was the result of her request."[3]

The record supports the trial court findings that Chamberlin's *Miranda* rights were not in question when she initiated the communication with Hawel. *See Edwards*, 451 U.S. at 485 (an accused is subject to further interrogation when the accused "initiates further communication, exchanges, or conversations with the police"). Clearly, Chamberlin's statement made during the fifth interview was admissible.

¶49. The trial court's finding that Chamberlin's statements were properly obtained in accordance with her *Miranda* rights is supported by the record. The trial court did not err in admitting the statements from each interrogation, and Chamberlin's argument is without merit.

¶50. Lastly, Chamberlin, citing *Agee v. State*, 185 So. 2d 671 (Miss. 1966), argues that in order for Chamberlin's confession to be admissible, the State must have produced all of the witnesses present at the alleged confession. Accordingly, Chamberlin asserts that since Barrett, to whom Chamberlin allegedly expressed her desire to speak to KBI officers, did not testify at the suppression hearing, the motion to suppress should have been granted. In *Agee* this Court stated:

> [w]hen objection is made to the introduction of the confession, the accused is entitled to a preliminary hearing on the question of the admissibility of the

---

[3]Barrett testified that Chamberlin communicated her request to speak to someone "late [on] the 29th or early the 30th." However, he corrected this statement during redirect. Describing the events on March 30 pertaining to the visit to the landfill with Chamberlin and Hawel, Barrett testified that after returning to the facility that night, he had his last conversation with Chamberlin, in which she told him she wanted to speak with a KBI agent.

confession . . . after the State has made out a prima facie case as to the voluntariness of the confession, *the accused offers testimony that violence, threats of violence, or offers of reward induced the confession*, then the State must offer all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any such witness.

*Agee*, 185 So. 2d at 673. In *Agee*, the Court held that the defendant's confession was inadmissible. *Agee*, 185 So. 2d at 674. One of the reasons for this holding was that, after the defendant testified at the hearing that the confession was involuntary, the State did not meet its burden by calling "all the officers who were present when the accused was questioned and when the confession was signed, or give an adequate reason for the absence of any such witness." *Agee*, 185 So. 2d at 673.

¶51. Chamberlin's argument fails for two reasons. First, Chamberlin did not testify at the suppression hearing or provide any evidence. Thus, the State was not required to rebut her testimony by calling all the officers present at the questioning or signing of the confession. Second, under *Agee*, Barrett would not have been a requisite witness since Lyon, Hawel and Ralston, all of whom testified at the suppression hearing, were the officers present at the interrogations in which Chamberlin was questioned and confessed. *See Agee*, 185 So. 2d at 673. The State did not veer from *Agee* in the suppression hearing in this case. Thus, this argument also is without merit.

## II. WHETHER THE TRIAL COURT ERRED IN ADMITTING THE EVIDENCE SEIZED FROM THE LANDFILL.

¶52. The standard of review for the suppression of evidence is abuse of discretion. *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003).

21

¶53. Chamberlin asserts that the trial court should have suppressed the evidence found in seven plastic bags recovered from the Russell County Dump in Russell County, Kansas. This evidence included Hullett's work uniform, a pillow, a photograph of the pillow, a woman's purse, a coin purse, a cigarette case, keys, camera and photos, a wallet, remains of Hullett's driver's license and paperwork, a partially completed Mississippi accident report form, a direct-deposit card, a Hattiesburg telephone directory, and the cardboard center from a roll of duct tape. Chamberlin argues that the evidence was recovered as a result of information obtained from her statements on March 30 and therefore, should have been excluded, since the officers initiated the interrogations on the morning of March 30, after Chamberlin invoked her *Miranda* rights.

¶54. The *Miranda* rule is employed to protect against violations of the Fifth-Amendment Self-Incrimination Clause. *United States v. Patane*, 542 U.S. 630, 636, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004). The exclusionary prohibition against "fruit of the poisonous tree" applies to violations of the Fifth-Amendment privilege against self-incrimination. *Brown v. Illinois*, 422 U.S. 590, 599, 45 L.Ed.2d 416, 95 S. Ct. 2254 (1975). Having found no Fifth-Amendment self-incrimination violation, we hold that the "fruit of the poisonous tree" doctrine is inapplicable to the evidence found in the dump. The trial court did not abuse its discretion by admitting the evidence in question, and this argument is without merit.

## GUILT PHASE

### III. WHETHER THE TRIAL COURT ERRED IN DENYING CHAMBERLIN'S *BATSON* CHALLENGE.

22

¶55.    During jury selection, Chamberlin objected to the State's use of seven of its twelve peremptory challenges to strike black individuals from the jury panel.  The United States Supreme Court has held that the equal protection clause prohibits exclusion of persons from participation in jury service on account of their race.  *Batson v. Kentucky*, 476 U.S. 79, 85, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).  This Court gives great deference to a trial court's determination under *Batson* because it is based largely on credibility.  *Batson*, 476 U.S. at 98, n.21; *Flowers v. State*, 947 So. 2d 910, 917 (Miss. 2007) (citing *Berry v. State*, 802 So. 2d 1033, 1037 (Miss. 2001)).  This Court will not overrule a trial court's *Batson* ruling absent finding the ruling was clearly erroneous or against the overwhelming weight of the evidence. *Flowers*, 947 So. 2d at 917.

¶56.    The *Batson* inquiry has three steps.  *Batson*, 476 U.S. at 93-94.  First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race.  *Rice v. Collins*, 546 U.S. 333, 338, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (citing *Batson*, 476 U.S. at 96-97).  Inequality under *Batson* draws from "the general equal protection principle that the 'invidious quality' of governmental action claimed to be racially discriminatory 'must ultimately be traced to a racially discriminatory purpose.'"  *Batson*, 476 U.S. at 93.  In order to establish a prima facie case, Chamberlin must show that the facts and circumstances give rise to the inference that the prosecutor exercised the peremptory challenges with a discriminatory purpose. *Strickland v. State*, 980 So. 2d 908, 915 (Miss. 2008); *Tanner v. State*, 764 So. 2d 385, 393 (Miss. 2000) (citing *Bush v. State*, 585 So. 2d 1262, 1268 (Miss. 1991)); *Randall v. State*,

23

716 So. 2d 584, 587 (Miss. 1998) (citing *Batson*, 476 U.S. at 94). "In deciding whether the defendant has made the requisite showing, the trial court should consider *all* relevant circumstances." *Batson*, 476 U.S. at 96 (emphasis added).

> The *Batson* doctrine is not concerned with racial, gender, or ethnic balance on petit juries, and it does not hold that a party is entitled to a jury composed of or including members of a cognizable group. Rather, it is concerned exclusively with discriminatory intent on the part of the lawyer against whose use of his peremptory strikes the objection is interposed.

*Strickland*, 980 So. 2d at 915 (quoting *Ryals v. State*, 794 So. 2d 161, 164 (Miss. 2001)). Therefore, the sheer number of strikes exercised against a cognizable group of jurors is not, in itself, dispositive. *Strickland*, 980 So. 2d at 916 (citing *Flowers*, 947 So. 2d at 935).

¶57. Once a prima facie case has been made, the prosecutor must present race-neutral reasons for the strikes. The reasons need not be persuasive, or even plausible; so long as the reasons are not inherently discriminatory, they will be deemed race-neutral. *Rice*, 546 U.S. at 338 (citing *Purkett v. Elem*, 514 U.S. 765, 767-768, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (per curiam)). Once the prosecutor proffers his explanation, and the Court determines that it is race-neutral and satisfies the prosecution's step-two burden of articulating a nondiscriminatory reason for the strike, the inquiry should proceed to step three, where the trial court determines whether the prosecutor was motivated by discriminatory intent. *Purkett*, 514 U.S. at 769.

¶58. Chamberlin objected numerous times to the State's use of challenges, ultimately using seven out of twelve challenges against blacks. The court allowed Chamberlin to argue her prima facie case. Counsel asserted:

24

My prima facie case is that seven out of twelve constitutes a pattern, and particularly – I mean of those that were available of the first, I believe seven of the first eight strikes went to African American jurors. I submit that constitutes a pattern with an inference of discrimination.

The court then directed the State to provide race-neutral reasons for its challenges exercised against blacks. The State offered race-neutral reasons for each juror it struck, explaining that each black juror was excluded based on his/her answers to the juror questionnaire, which the State compiled and both parties agreed to.

¶59. The State struck juror number five because she answered that she had personal views against the death penalty that would prevent her or impair her from reaching a verdict; her beliefs were so strong that she could not vote for death for the defendant; she was uncertain whether she was emotionally capable of announcing her verdict; she was uncertain whether she would hold the State to a greater burden; and she would need to be one-hundred-percent certain of the defendant's guilt.

¶60. The State struck juror number thirty-eight because she was uncertain that she was emotionally capable of announcing her verdict; she was uncertain whether she would require a greater burden from the State; and she was uncertain whether she would need to be one-hundred-percent certain of the defendant's guilt.

¶61. The State struck juror number eighty-one because she answered that she was uncertain whether she was emotionally capable of standing up and announcing her verdict in court; she was uncertain whether she could follow the law given by the court; she would hold the State to a greater burden; she would require one-hundred-percent certainty of guilt; she would be

25

less likely to find someone guilty if there was the possibility of the death penalty; and she had a family member who had been recently convicted on a drug charge in that county. The State conducted an individual voir dire of juror number eighty-one, in which she confirmed several of the questionnaire answers which the State proffered for striking her.

¶62.    The State struck juror number ninety-two because she answered that she would require one-hundred-percent certainty of guilt; she would have a problem voting for the death penalty without concrete evidence; and she would not feel comfortable seeking the death penalty because of fear of retaliation to herself or her family.

¶63.    The State struck juror number 104 because he answered that he was uncertain whether he was emotionally capable of standing up in court and announcing his verdict; he was uncertain whether he would hold the State to a greater burden; and he would want to be one-hundred-percent certain of guilt.

¶64.    The State struck juror number 106 because he answered that he was uncertain whether he was emotionally capable of rendering a verdict; he was uncertain whether he would hold the State to a greater burden; and he would require one-hundred-percent certainty.

¶65.    The State struck juror number 117 because she answered that she could not set aside her personal opposition or hesitancy to the death penalty and evaluate the case based on what the judge would provide and the facts and circumstances presented; she would require the State to meet a greater burden of proof; and she was uncertain whether she would require one-hundred-percent certainty of guilt.

26

¶66.     Chamberlin asserts that the trial court erred first by not making a clear determination that Chamberlin had established a prima facie case of discrimination by showing that the State had exercised seven of its twelve peremptory challenges to strike black jurors from the regular panel.  This argument is moot since all three steps of the *Batson* analysis were completed. *See Hernandez v. New York*, 500 U.S. 352, 359, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991).  The United States Supreme Court has held that under *Batson,* "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359.  In *Thomas v. State*, 818 So. 2d 335, 342-45 (Miss. 2002), where the trial judge did not make a definitive ruling on whether the objector had made a prima facie case, this Court held that such a ruling was moot, since the judge decided the ultimate question of whether the State exercised its challenges with a discriminatory purpose.

¶67.     For the first four jurors challenged, jurors five, thirty-eight, eighty-one, and ninety-two, Chamberlin offered no rebuttal to the State's reasons.  As the State asserts, Chamberlin is procedurally barred from arguing pretext as to the first four jurors, for whom she did not argue pretext to the trial court.  *See Flowers*, 947 So. 2d at 921-922 (citing *Evans v. State*, 725 So. 2d 613, 632 (Miss. 1997) (finding that the defendant's argument of pretext was barred from consideration on appeal because the argument as to that particular juror was presented for the first time on appeal)).

¶68. On the remaining three challenged jurors, jurors 104, 106, and 117, Chamberlin argued reasons why they would make good jurors but failed to rebut the specific reasons proffered by the State for striking them. The objector must come forward with proof when given the opportunity for rebuttal. *Thomas v. State*, 818 So. 2d at 344. "[I]f the defendant offers no rebuttal, the trial court is forced to examine only the reasons given by the State." *Thorson v. State*, 895 So. 2d 85, 119 (Miss. 2004) (quoting *Walker v. State*, 815 So. 2d 1209, 1215 (Miss. 2002) (quoting *Bush*, 585 at 1268)). Because Chamberlin failed to offer any proof that the State's reasons were pretextual, the State's reasons for the challenges were the only considerations before the trial judge. *See Thomas*, 818 So. 2d at 345.

¶69. This Court must then evaluate "the persuasiveness of the justification" proffered by the prosecutor, while keeping in mind that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Rice*, 546 U.S. at 338; *Purkett*, 514 U.S. at 768.

¶70. The State exercised seven out of twelve peremptory strikes against blacks and five against venire persons who were not black. The State tendered a total of four potential black jurors, two of whom the defendant struck. The resulting jury included two black veniremen. The State offered reasons for the strikes that the trial court considered race-neutral, and the defense failed to rebut those reasons. Therefore, the defense did not meet its burden to show "that the facts and circumstances give rise to the inference that the prosecutor exercised the peremptory challenges with a discriminatory purpose." Considering the totality of the

28

evidence, the trial court's ruling on Chamberlin's **Batson** challenge was neither clearly erroneous nor against the overwhelming weight of the evidence.

IV.   WHETHER THE TRIAL COURT ERRED IN ALLOWING THE INTRODUCTION OF GRUESOME PHOTOGRAPHS OF THE VICTIMS.

¶71.   Chamberlin argues that, over her objections, the trial court admitted thirteen prejudicial photographs, each of which she alleges had no probative value. The State replies that each photograph was relevant, as it aided in describing the circumstances of the killings or causes of death, or clarifying or supplementing the witness's testimony to the jury.

¶72.   Chamberlin cites **Sudduth v. State**, 562 So. 2d 67, 70 (Miss. 1990), for this Court's statement that "photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the corpus delicti and the identity of the deceased have been established." **Id.** at 70. (citing **Davis**, 551 So. 2d at 173; **Shearer v. State**, 423 So. 2d 824, 827 (Miss. 1982)). However, Chamberlin ignores the declaration immediately following in which the Court stated, "[p]hotographs of bodies may nevertheless be admitted into evidence in criminal cases where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory." **Sudduth**, 562 So. 2d at 70 (citing **Davis**, 551 So. 2d at 173; **Griffin v. State**, 504 So. 2d 186, 191 (Miss. 1987); Miss. R. Evid. 403).

¶73.   Admission of photographs by the trial court is reviewed for abuse of discretion. **Dampier v. State**, 973 So. 2d 221, 230 (Miss. 2008). A decision favoring admissibility will not be disturbed absent a clear abuse of that judicial discretion. **Id.** The discretion of the trial

judge is "almost unlimited . . . regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Id.* (quoting *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987)). *See also Bennett v. State*, 933 So. 2d 930, 946 (Miss. 2006); *Jones v. State*, 920 So. 2d 465, 476 (Miss. 2006); *McIntosh v. State*, 917 So. 2d 78, 83-84 (Miss. 2005); *Dubose v. State*, 919 So. 2d 5, 11 (Miss. 2005); *Blake v. Clein*, 903 So. 2d 710, 728 (Miss. 2005); *Hodges v. State*, 912 So. 2d 730, 781 (Miss. 2005). "Some probative value is the only requirement needed in order to support a trial judge's decision to admit photographs into evidence." *Jones*, 920 So. 2d at 476-477 (quoting *Jordan v. State*, 728 So. 2d 1088, 1094 (Miss. 1998) (quoting *Scott v. State*, 878 So. 2d 933, 985 (Miss. 2004), *overruled in part by Lynch v. State*, 951 So. 2d 549 (Miss. 2007)); *McIntosh v. State*, 917 So. 2d at 84. "So long as a photograph has probative value and its introduction serves a meaningful evidentiary purpose, it may still be admissible despite being gruesome, grisly, unpleasant, or even inflammatory. *Dampier*, 973 So. 2d at 230 (citations omitted). *But see McNeal v. State*, 551 So. 2d 151 (Miss. 1989)) (the solitary instance where this Court held a photograph, a close-up of the victim's partly decomposed skull, was gruesome and lacked an evidentiary purpose and was more prejudicial than probative). A photograph has a meaningful evidentiary purpose when it: (1) aids in describing the circumstances of the killing; (2) describes the location of the body or cause of death; or (3) supplements or clarifies witness testimony. *Dampier*, 973 So. 2d at 230.

¶74.    Similarly, autopsy photographs are admissible only if they possess probative value. *Hodges*, 912 So. 2d at 781-82 (citing *Puckett v. State*, 737 So. 2d 322, 338 (Miss. 1999);

30

*Noe v. State*, 616 So. 2d 298 (Miss. 1993)).  The comment to Mississippi Rule of Evidence 401 states that if there is any probative value, the rule favors admission of the evidence. *Thorson*, 895 So. 2d at 120.

¶75.    The State cites *Simmons v. State*, 805 So. 2d 452, 485 (Miss. 2001).  In *Simmons*, the defendant gutted, beheaded, and dismembered the victim and discarded the parts in a bayou. *Simmons*, 850 So. 2d at 470.  The defense argued that the trial court erred in admitting into evidence a photograph of the victim's severed head.  *Id.* at 485.  This Court stated the aforementioned test that "[p]hotographs of the victim have evidentiary value when they aid in describing the circumstances of the killing, the location of the body, the cause of death, or clarify or supplement a witness's testimony."  *Simmons*, 805 So. 2d at 485 (citation omitted).

¶76.    In *Simmons*, the State used the photograph in question numerous times.  *Id.* at 485. Once, an officer used it to identify the victim's head.  *Id.*  To the defendant's objection, the State responded that it needed the photograph to identify the flesh found in the bayou as human, and specifically, as belonging to the victim.  *Id.*  The judge overruled the objection and the photo was entered into evidence.  *Id.* at 486.  The State again used the photograph when questioning the victim's girlfriend.  *Id.* at 486.  She positively identified the head in the photograph as that of the victim's.  *Id.*  This Court held that "[s]ince the discretion of the trial judge runs toward unlimited admissibility, it is impossible for this Court to say that the trial judge abused his discretion."  *Id.* at 486.

¶77. Of the thirteen photographs in question in this case, two depicted the bodies as they were found at the Gillett farm. Exhibit 48 showed Hullett's body in the top of the freezer, and Exhibit 49 showed Heintzelman's body after removal from the freezer, still wrapped in a blanket as it had appeared in the bottom of the freezer upon thawing. The State entered the photographs during the testimony of a KBI officer who was describing what he saw at the crime scene. He testified that the photographs aided him in explaining what he saw.

¶78. The remaining ten photographs were taken during the autopsies performed by Dr. Donald Pojman. Dr. Pojman chose these photographs from his file for the purpose of helping him explain the injuries about which he would testify to the jury. Dr. Pojman testified as to each photograph that it was either necessary or would aid him in explaining to the jury the injuries he found. Each photograph varied in its depiction of scratches, scrapes and lacerations on various parts of each victim's body, including on Hullett's disarticulated arms; stab wounds and long cuts on Heintzelman's back; and lacerations and holes in each victim's head from hammer-inflicted injuries. The trial court admitted each photograph over the defendant's objection that the photographs were inflammatory, that their probative value was outweighed by their inflammatory nature, and that the photographs "[went] beyond any probative necessity."

¶79. The question as to each photograph is whether it: (1) had probative value and (2) aided in described the circumstances of the killing, described the location of the body and cause of death, or supplemented or clarified witness testimony. As in *Simmons*, each picture to which the defense objected satisfied both of these requirements. *See Simmons*, 805 So.

32

2d at 485-86.  In order to exclude any photograph, the trial court would have been required

to find as to any particular photograph that, pursuant to Mississippi Rule of Evidence 403,

the probative value of such photograph was substantially outweighed by the danger of unfair

prejudice.  With Rule 403 and the record in this case squarely before us, we cannot find that

the trial court abused its discretion in allowing these photographs to be admitted into

evidence; therefore, this assignment of error is without merit.

**SENTENCING PHASE**

### V.     WHETHER THE TRIAL COURT ERRED IN DENYING SENTENCING INSTRUCTIONS D-3 AND D-10.

¶80.    Whether to give a jury instruction is within the sound discretion of the trial court.

***Goodin v. State***, 787 So. 2d 639, 657 (Miss. 2001).  Chamberlin argues that the trial court

erred when it refused to give two proposed instructions, D-3 and D-10. Proposed instruction

D-3 read:

> A mitigating circumstance is that which in fairness or mercy may be
> considered as extenuating or reducing the degree of moral culpability or blame
> which justify a sentence of less than death, although it does not justify or
> excuse the offense. The determination of what are mitigating circumstances is
> for you as jurors to resolve under the facts and circumstances of this case.
>     The appropriateness of the exercise of mercy can itself be a mitigating
> factor you may consider in determining whether the State has proved beyond
> a reasonable doubt that the death penalty is warranted.

¶81.    Proposed instruction D-10 read:

> If based upon your consideration of the aggravating and mitigating
> circumstances each and every one of you agrees that death is the appropriate
> sentence, you must still consider the final step of the penalty phase process.
> Just as you are the sole judges of the facts, so too are you the sole arbiters of
> mercy. Regardless of your consideration of aggravating and mitigating

33

circumstances, as the jury, you always have the option to recommend against death. This means that even if you conclude that death is an appropriate sentence based on your consideration of mitigating and aggravating circumstances, you may still show mercy and sentence Ms. Chamberlin to life in prison. As a jury, this option to recommend life must always be considered by each and every one of you before an ultimate and irrevocable sentence may be passed.

¶82.    Chamberlin argues that *Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), required the trial court to give a mercy instruction in this case. However, *Marsh* does not speak to or even consider the issue of whether a mercy instruction is required. Rather, the *Marsh* Court held that "the States enjoy a constitutionally permissible range of discretion in imposing the death penalty." *Marsh*, 126 S. Ct. at 2525 (quoting *Blystone v. Pennsylvania*, 494 U.S. 299, 308, 110 S. Ct. 1078, 108 L.Ed. 2d 262 (1987)) (internal quotations omitted). "[T]he States are free to determine the manner in which a jury may consider mitigating evidence," i.e., whether the evidence should be viewed through the lens of mercy.  *Marsh*, 126 S. Ct. at 2523.

¶83.    That discretion allows trial courts to avoid the potential arbitrariness of an emotional decision encouraged by a mercy instruction.

>   This Court has repeatedly held that "capital defendants are not entitled to a mercy instruction." *Jordan v. State*, 728 So. 2d 1088, 1099 (Miss. 1998) (citing *Underwood v. State*, 708 So. 2d 18, 37 (Miss. 1998); *Hansen v. State*, 592 So. 2d 114, 150 (Miss. 1991); *Williams v. State*, 544 So. 2d 782, 788 (Miss. 1987); *Lester v. State*, 692 So. 2d 755, 798 (Miss. 1997); *Jackson v. State*, 684 So. 2d 1213, 1239 (Miss. 1996); *Carr v. State*, 655 So. 2d 824, 850 (Miss. 1995); *Foster v. State*, 639 So. 2d 1263, 1299-1301 (Miss. 1994); *Jenkins v. State*, 607 So. 2d 1171, 1181 (Miss. 1992); *Nixon v. State*, 533 So. 2d 1078, 1100 (Miss. 1987)). "The United States Supreme Court has held that giving a jury instruction allowing consideration of sympathy or mercy could induce a jury to base its sentencing decision upon emotion, whim, and caprice

34

instead of upon the evidence presented at trial." *Id.* (citing *Saffle v. Parks,* 494 U.S. 484, 492-95, 110 S. Ct. 1257, 1262-64, 108 L. Ed. 2d 415 (1990)).

*Howell v. State*, 860 So. 2d 704, 759 (Miss. 2003). *See also* **Ross**, 954 So. 2d at 1012 (holding there was no error in refusing the defendant's proposed instruction specifically citing mercy or sympathy as a mitigator since "a capital defendant is not entitled to a sympathy instruction, because, like a mercy instruction, it could result in a verdict based on whim and caprice"); *King v. State*, 784 So. 2d 884, 890 (Miss. 2001) ("neither side is entitled to a jury instruction regarding mercy or deterrence"); *Wiley v. State*, 750 So. 2d 1193, 1204 (Miss. 1999) ("[T]he State must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice.").

¶84. Additionally, the requested instruction D-10 states that "even if you conclude that death is an appropriate sentence based on your consideration of mitigating and aggravating circumstances, you may still show mercy and sentence Ms. Chamberlin to life in prison." This Court has found that "a defendant is not entitled to an instruction that the jury may return a life sentence even if the aggravating circumstances outweigh the mitigating circumstances or if they do not find any mitigating circumstances." *King v. State*, 960 So. 2d 413, 442 (Miss. 2007) (citing *Holland v. State*, 705 So. 2d 307, 354 (Miss. 1997), *Hansen v. State*, 592 So. 2d 114, 150 (Miss. 1991), *Goodin v. State*, 787 So. 2d 639, 657 (Miss. 2001), *Foster v. State*, 639 So. 2d 1263, 1301 (Miss. 1994)). "[T]his Court has repeatedly refused to accept instructions that would nullify the balancing of aggravating and mitigating

35

factors, since such instructions might induce verdicts based on whim and caprice."***Ross***, 954 So. 2d at 1012 (citing ***Manning v. State***, 726 So. 2d 1152, 1197 (Miss. 1998), *overruled in part by **Weatherspoon v. State***, 732 So. 2d 158 (Miss. 1999)).

¶85. The trial court did not abuse its discretion in refusing either instruction. This issue is without merit.

> **VI.   WHETHER THE TRIAL COURT ERRED IN DENYING CHAMBERLIN'S PETITION FOR PAYMENT OF TRAVEL AND RELATED EXPENSES FOR MITIGATION WITNESSES.**

¶86. Chamberlin argues that the trial court erroneously denied her petition for payment of travel and related expenses for her aunt and childhood best friend, who were to testify during the sentencing phase. The State responds that Chamberlin never obtained a ruling from the trial court on her petition, and thus, the issue is procedurally barred.

> Under Rule 2.04 of the Uniform Rules of Circuit and County Court Practice, the burden is on the movant to obtain a ruling on a pre-trial motion, and failure to do so constitutes a procedural bar. *See **Berry v. State***, 728 So. 2d 568, 570 (Miss. 1999) ("It is the responsibility of the movant to obtain a ruling from the court on motions filed by him and failure to do so constitutes a waiver of same."); ***Holly v. State***, 671 So. 2d 32, 37 (Miss. 1996) (finding that the burden to obtain a ruling on an in limine motion to exclude evidence rests on the moving party); ***Martin v. State***, 354 So. 2d 1114, 1119 (Miss. 1978) (same).
>
> . . .
>
> "It is the duty of the movant, when a motion . . . is filed . . . to pursue said motion to hearing and decision by the court. Failure to pursue a pretrial motion to hearing and decision before trial is deemed an abandonment of that motion; however, said motion may be heard after the commencement of trial in the discretion of the court." U.R.C.C.C. 2.04.

*Ross*, 954 So. 2d at 992. Chamberlin's failure to obtain a ruling on her pre-trial motion was a direct result of her failure to request a ruling at an appropriate time. The trial court heard several pre-trial motions brought by the defense, including a motion for severance, a motion for change of venue, and a motion for funds for an expert psychologist. The trial court granted the motion for severance and the motion for change of venue. However, the defendant did not present to the trial court her motion for payment of travel expenses. Therefore, the trial court did not, in fact, decline Chamberlin's pre-trial motion, rather, it did not rule on it at all. This Court agrees with the State that this issue is procedurally barred.

¶87.    Further, this issue is without merit. Chamberlin asserts that this denial of travel expenses for the two witnesses constituted a violation of her rights to due process, equal protection of law and a reliable capital sentencing hearing, in violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution. Chamberlin cites *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L.Ed.2d 1 (1982), among other cases, in support of this argument. This Court previously has stated:

> [w]hile under the holding of the United States Supreme Court in *Eddings v. Oklahoma*, 455 U.S. 104, 113-115, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982), it might have been proper in the sentencing phase of the trial to have such witnesses testify on Johnson's background, that case is not authority for the proposition that a state is required to furnish travel expenses for out-of-state prospective character witnesses.

*Johnson v. State*, 477 So. 2d 196, 215 (Miss. 1985). The opinion went on to state that defense counsel was, at a minimum, "under a duty to furnish detailed statements in affidavit form from each of these proposed witnesses as to what their testimony would be in the trial of the case." *Id.* The only thing counsel in that case presented was an unsworn summary as

37

to what the witnesses might have testified. *Id.* The information in *Johnson* exceeded the information provided in this case. Chamberlin's petition consisted only of the statements that: (1) Chamberlin was a pauper; (2) the two witnesses for which funds were requested did not have adequate funds for lodging or travel; and (3) those witnesses were "vital to the defense of the Defendant." This Court finds the purpose of these two witnesses was that of character witnesses, according to Chamberlin's post-trial notice of filing of her statement of evidence, where she claimed denial of the travel expenses in question violated her right to present the jury the full range of her mitigating factors.[4] Further, the psychologist testified as a mitigating witness during the sentencing phase concerning information she gathered from interviewing the aunt and childhood best friend about Chamberlin.

¶88.    Chamberlin failed to meet her duty to provide sufficient information to the trial court, and she further failed to obtain a ruling on her motion. Therefore, this argument is not only procedurally barred, but also without merit.

## VII. PROPORTIONALITY.

¶89.    Mississippi Code Annotated Section 99-19-105(3) (Rev. 2007) requires this Court to perform a proportionality review when affirming a death sentence in a capital case. Section 99-19-105(3) states:

(3) With regard to the sentence, the court shall determine:

---

[4]The State further argues that Chamberlin is procedurally barred from having this Court consider her statement of evidence, filed pursuant to Mississippi Rules of Evidence Rule 10(c), which states that while the trial court did not rule on her motion on the record, the trial court advised her that it would not authorize the funding. Having found both that this issue is procedurally barred and that it had no merit, this Court need not address this argument.

38

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; (b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101; (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

¶90.   After reviewing the record in this appeal as well as the death penalty cases listed in the appendix (attached), we conclude that Chamberlin's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

¶91.   We also find that the evidence is more than sufficient to support the jury's finding of statutory aggravating circumstances.  The jury unanimously found as to the murders of both Hullett and Heintzelman that the aggravating circumstances were: "[t]he capital offense was committed while the defendant was engaged [in] or was an accomplice in the commission of or an attempt of flight after committing a robbery" (Miss. Code Ann. § 99-19-101(5)(d)); "the capital offense was committed for the purpose of avoiding or preventing a lawful arrest" (Miss. Code Ann. § 99-19-101(5)(e));  and "the capital offense was especially heinous, atrocious, or cruel" (Miss. Code Ann. § 99-19-101(5)(h)).

¶92.   Further, upon comparison with other factually similar cases in which the death sentence was imposed, the sentences of death were neither excessive nor disproportionate in this case.  Finally, we find that the jury did not consider any invalid aggravating circumstances. Therefore, this Court affirms the death sentences imposed in this case.

**CONCLUSION**

39

¶93. Based upon the aforementioned analysis, this Court affirms the final judgments and sentences of the Circuit Court of Forrest County as to Chamberlin for the murders of Hullett and Heintzelman.

¶94. **COUNTS I AND II: CONVICTIONS OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.**

**SMITH, C.J., WALLER, P.J., EASLEY, CARLSON, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, P.J., CONCURS IN RESULT ONLY.**

# APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Loden v. State,* 971 So. 2d 548 (Miss. 2007).

*King v. State,* 960 So. 2d 413 (Miss. 2007).

*Bennett v. State,* 933 So. 2d 930 (Miss. 2006).

*Havard v. State,* 928 So. 2d 771 (Miss. 2006).

*Spicer v. State,* 921 So. 2d 292 (Miss. 2006).

*Hodges v. State,* 912 So. 2d 730 (Miss. 2005).

*Walker v. State,* 913 So. 2d 198 (Miss. 2005).

*Le v. State,* 913 So. 2d 913 (Miss. 2005).

*Brown v. State,* 890 So. 2d 901 (Miss. 2004).

*Powers v. State* 883 So. 2d 20 (Miss. 2004)

*Branch v. State,* 882 So. 2d 36 (Miss. 2004).

*Scott v. State,* 878 So. 2d 933 (Miss. 2004).

*Lynch v. State,* 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State,* 875 So. 2d 140 (Miss. 2004).

*Byrom v. State,* 863 So. 2d 836 (Miss. 2003).

*Howell v. State,* 860 So.2d 704 (Miss. 2003).

*Howard v. State,* 853 So. 2d 781 (Miss. 2003).

*Walker v. State,* 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So. 2d 934 (Miss. 2002).

*Stevens v. State,* 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So. 2d 241 (Miss. 2002).

*Knox v. State,* 805 So. 2d 527 (Miss. 2002).

*Simmons v. State,* 805 So. 2d 452 (Miss. 2002).

*Berry v. State,* 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*, 800 So. 2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So. 2d 192 (Miss. 2001).

*Puckett v. State,* 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State,* 787 So. 2d 639 (Miss. 2001).

*Jordan v. State,* 786 So. 2d 987 (Miss. 2001).

*Manning v. State,* 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).    *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*__*Shell v. State__*, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

**Davis v. State**, 551 So. 2d  165 (Miss. 1989).

**Minnick v. State**, 551 So. 2d 77 (Miss. 1989).

*__*Pinkney v. State__*, 538 So. 2d 329 (Miss. 1989), **Pinkney v. Mississippi**, 494 U.S. 1075 (1990) vacating and remanding **Pinkney v. State**, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*__*Clemons v. State__*, 535 So. 2d 1354 (Miss. 1988), **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

**Woodward v. State**, 533 So. 2d 418 (Miss. 1988).

**Nixon v. State**, 533 So. 2d 1078 (Miss. 1987).

**Cole v. State**, 525 So. 2d 365 (Miss. 1987).

**Lockett v. State**, 517 So. 2d 1346 (Miss. 1987).

**Lockett v. State**, 517 So. 2d 1317 (Miss. 1987).

**Faraga v. State**, 514 So. 2d 295 (Miss. 1987).
*__*Jones v. State__*, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

**Wiley v. State**, 484 So. 2d 339 (Miss. 1986).

**Johnson v. State**, 477 So. 2d 196 (Miss. 1985).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE
## AND SENTENCE PHASE

*Ross v. State,* 954 So. 2d 968 (Miss. 2007).

*Flowers v. State,* 947 So. 2d 910 (Miss. 2006).

*Flowers v. State,* 842 So. 2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So. 2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*,  531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

# DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO
## PUNISHMENT AND REMANDED FOR A NEW TRIAL
## ON SENTENCING PHASE ONLY

*Rubenstein v. State,* 941 So. 2d 735 (Miss. 2006).

*King v. State,* 784 So. 2d 884 (Miss. 2001).

*Walker v. State,* 740 So. 2d 873 (Miss. 1999).

*Watts v. State,* 733 So. 2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied **Wiley v. Mississippi***, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).  * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.